REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 164

September Term, 2015

_____

TERRENCE ROGERS

v.

HOME EQUITY USA, INC.

_____

Wright,
Graeff,
Eyler, James R.
        (Retired, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: July 26, 2016

This appeal arises out of a complaint filed by Terrence Rogers, appellant, alleging that he suffered damages from exposure to lead while living at 3738 Towanda Avenue, in Baltimore, Maryland (the "Towanda Property"). In this Court, he challenges the order of the Circuit Court for Baltimore City granting summary judgment in favor of the owner of the Property, Home Equity USA, Inc. ("Home Equity"), appellee, on the ground that Mr. Rogers did not have sufficient evidence to demonstrate that the Towanda Property was the source of his lead exposure and elevated lead levels in 1997.

On appeal, Mr. Rogers presents one question for our review, which we have rephrased slightly, as follows:

> Did the circuit court err in granting Home Equity's Motion for Summary Judgment on the ground that Mr. Rogers failed to establish that the Towanda Property contained lead-based paint, and therefore, he failed to meet his burden to show that the Property was a substantial factor in causing his injuries?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

Mr. Rogers was born on February 28, 1994. From his birth until March 1998, when he moved to New York with his mother, Toni Rogers-Coy, Mr. Rogers lived in numerous locations in Baltimore, often staying at each location for very brief periods of time. [1]

---

[1] Home Equity states that Mr. Rogers did not respond to its requests for admissions until after it filed its motion for summary judgment. It argues that, pursuant to Md. Rule 2-424(b), which provides that "[e]ach matter of which an admission is requested shall be deemed admitted" if not answered within 30 days, Mr. Rogers's failure to timely respond to Home Equity's request for admissions results in his admitting that he lived in multiple residences, both before and after he lived at the Towanda Property, and he was exposed to lead at those residences. Mr. Rogers did not specifically contest this assertion. We note, however, the circuit court's comment that, even if the matters requested (continued . . .)

For the first "couple months" after Mr. Rogers was born, he lived at 2328 Nevada Street in Baltimore. Later in 1994, after temporarily residing at various other locations, Mr. Rogers moved to 6149 Chinquapin Parkway in Baltimore ("6149 Chinquapin"), where he lived until approximately October 1996.[2] For at least the first year of his residence at 6149 Chinquapin, the windows, doors, and radiators were in poor condition, with "broken pieces of paint."

Following his residence at 6149 Chinquapin, Mr. Rogers moved to the Towanda Property, which was built in 1920. He lived at that residence for approximately six months.

With respect to the presence of lead in the Towanda Property, Mr. Rogers admitted evidence that, in 1976, 20 years prior to his residency, the Baltimore City Health Department ("BCHD") required a lead abatement of the Towanda Property (the "1976 Abatement") after an inspection and analysis showed that certain areas tested positive for lead in paint-chip sampling, and eight areas of flaking paint were in need of corrective

---

(. . . continued) were deemed admitted, it was of no moment because Mr. Rogers' position was that there was enough direct evidence of exposure at the Towanda Property that "could be a substantial factor in addition to those other properties."

[2] There does appear to be a factual dispute regarding when Mr. Rogers moved to the Towanda Property. Mr. Rogers asserts that, in a light most favorable to him, the evidence showed that he began living at the Towanda Property in October 1996, "based on information in Kennedy Krieger Institute medical records, Maryland Department of Social Services records, as well as statements from Ms. Rogers-Coy." As Home Equity points out, however, some of the records indicate that the date was in 1997. If this fact was critical, we could not affirm the grant of summary judgment. Home Equity argues, however, that even relying on the October 1996 date, the circuit court properly granted summary judgment. We will proceed using the October 1996 date.

2

action.  In October 1976, the BCHD issued an abatement card, indicating that abatement work had been completed.

Subsequently, additional improvements were made to the property.  In 1979, the Baltimore City Department of Housing and Community Development ("DHCD") issued a building permit for a new gas boiler.  In 1983, the DHCD issued a rehab permit, which involved roofing, carpentry, plumbing repairs, and painting.  In February 1994, DHCD issued a permit for $19,000 worth of rehabilitation work, which included re-stuccoing the home and repairing the rear decks.

Ms. Rogers-Coy moved to the Towanda Property when "[s]omeone told [her] about it," and she paid rent to another tenant who was "just trying to help [her] out until [she] got where [she] was trying to go."  Because she was not a party to the lease, she had no evidence of chipping, flaking, or peeling paint at the inception of the lease.  She did not know if the tenant owned the property, and she paid him "what [she] could."  In her deposition, Ms. Rogers-Coy described the windows in the Towanda Property as having "really bad" chipping and flaking paint, and she stated that they "were actually more flaky than Chinquapin was."  Ms. Rogers-Coy testified in her deposition that she left the Towanda Property between March and April 1997, after residing there for approximately six months.  At that point, she and Mr. Rogers moved to 2534 Loyola Northway.

Mr. Rogers was tested for elevated lead levels on multiple occasions.  His medical records show the following results, which the parties do not dispute:

3

| Date | Blood Lead Level[3] | Address |
|---|---|---|
| 6/29/95 | 7 µg/dL | 6149 Chinquapin |
| 3/25/96 | 14 µg/dL | 6149 Chinquapin |
| 1/8/97 | 21 µg/dL | 3738 Towanda |
| 3/26/97 | 20-21 µg/dL | 3738 Towanda |
| 4/30/97 | 17-18 µg/dL | 2534 Loyola Northway |
| 8/22/97 | 13 µg/dL | Foster care/ 2534 Loyola Northway |

Following his test on January 8, 1997, Mr. Rogers was referred to the Community Health Nurse for evaluation. On March 17, 1997, a caseworker from the Lead Paint Poisoning Prevention Program met with Ms. Rogers-Coy at the Towanda Property. The caseworker noted that the house was "in very [] dilapidated condition." Mr. Rogers, who was three years old at the time, was observed "mouthing the window sills in the house." The property had flaking paint "inside and outside," but Mr. Rogers was "listed as playing indoors and not outdoors."

As a result of Mr. Rogers' increased blood lead level test on January 8, 1997, he was referred to the Kennedy Krieger Institute Lead Poisoning Prevention Clinic. On March 26, 1997, Ms. Rogers-Coy took Mr. Rogers to Kennedy Krieger, and his blood lead level tested 20, 21 µg/dL. Ms. Rogers-Coy reported at that time that Mr. Rogers was at the Towanda Property "[a]ll the time," and there was interior flaking paint on the ceiling, walls, window frame, windowsills, window wells, and woodwork. She reported exterior flaking

---

[3] Blood lead levels are measured in micrograms per deciliter.

4

paint on the front porch and window frames. There were no replacement windows. During a follow-up appointment on April 30, 1997, while Mr. Rogers was living at 2534 Loyola Northway, his blood lead levels were 17, 18 µg/dL.

On May 29, 2013, Mr. Rogers filed a complaint in the Circuit Court for Baltimore City against Home Equity and the owners of 6149 Chinquapin, asserting claims of negligence and unfair trade practices relating to his alleged exposure to lead: (1) between 1994 and 1996 at 6149 Chinquapin, and (2) between 1996 and 1997 at the Towanda Property, which was owned by Home Equity. He alleged that, at all times during his tenancies, the properties contained lead-based paint in such a deteriorated condition that it was peeling, chipping, and flaking from the walls, baseboards, windowsills, and other areas of the premises, and that Home Equity and the owners of 6149 Chinquapin knew or had reason to know of the hazardous conditions. He alleged that, as a consequence of his exposure to lead-based paint, Mr. Rogers "suffered permanent brain damage resulting in developmental and behavioral injuries."[4]

On February 12, 2014, Home Equity answered the complaint, and discovery commenced. Dr. Robert Simon, a Ph.D. with ETI Environmental Laboratory ("ETI"), provided a report including the following conclusions:

> It was my conclusion, to a reasonable degree of scientific probability, that [the Towanda Property] was a pre-1950 house confirmed with the presence of lead based paint by BCHD testing in 1976. The presence of lead based paint hazards was confirmed by BCHD in 1976 and on 03/17/97. The

---

[4] On October 22, 2014, Mr. Rogers voluntarily dismissed his claims against the owners of 6149 Chinquapin, and they are not parties to this appeal.

5

need for continuing abatement of lead based paint hazards from 2008 to 2013 was listed in the [housing authority] records.

It was my conclusion, to a reasonable degree of scientific probability, that the 21 µg/dL elevated blood lead levels of the plaintiff on 01/08/97 and 03/26/97 both occurred while he was living at [the Towanda Property]. The documented presence of lead based paint hazards and his [elevated blood levels] while residing there led me to conclude that [the Towanda Property] was a substantial contributing source of his lead exposure and lead poisoning during his early childhood.

On December 8, 2014, Home Equity moved for summary judgment. In its motion, Home Equity asserted that, throughout his life, Mr. Rogers lived in, and was exposed to, lead in multiple residences, and therefore, he was unable to draw a causal relationship between his residence at the Towanda Property and any alleged damages.[5] Further, Home Equity asserted that Mr. Rogers' expert witnesses, Arc Environmental, Inc. ("Arc") and Dr. Simon, acknowledged that Mr. Rogers was exposed to lead at other residences and could not eliminate the other properties as the cause of his alleged injuries.

Home Equity attached to the motion for summary judgment a November 1, 2013, report prepared by Arc, which showed that Arc tested the interior and exterior of 6149 Chinquapin and found lead-based paint above the Maryland standard. An October 15, 2014, report issued by Arc with respect to the Towanda Property, however, indicated that Arc tested only the exterior of the Towanda Property, and Home Equity asserted that mere

---

[5] Again, Home Equity is relying on Maryland Rule 2-424(b), relating to the failure to respond to requests for admissions, to argue that Mr. Rogers lived in multiple residences where he was exposed to lead. As Home Equity points out, Mr. Rogers does not contest this assertion.

6

testing of the exterior of a home is not sufficient to establish that the home was a substantial contributing source of alleged lead exposure.

With respect to Dr. Simon, Mr. Rogers' causation expert, Home Equity stated that, although Dr. Simon asserted in his report, which was attached to the motion for summary judgment, that the Towanda Property was a substantial contributing source of Mr. Rogers' lead exposure, he conceded in his subsequent deposition that multiple properties likely contributed to Mr. Rogers' lead exposure, and based on an elevated blood lead level of 14μg/dL on March 25, 1996, "there existed a substantial contributing factor to [Mr. Rogers'] lead exposure before he ever lived at the Towanda Property." Dr. Simon admitted that he was not qualified to testify as to the specific causation of any injury to Mr. Rogers because he was not a medical doctor. He stated that he did not collect or analyze any samples in forming his opinion that the Towanda Property was a contributing cause of Mr. Rogers' alleged injuries.

Home Equity asserted that Dr. Simon's conclusion that the Towanda Property was a substantial contributing cause of Mr. Rogers' alleged lead exposure was based solely on the age of the property,[6] the deposition testimony of Ms. Rogers-Coy, documentation of the 1976 Abatement, which he opined was a "limited abatement," and the lack of information that any flaking paint at the Towanda Property in the 1990s was not lead-

---

[6] Dr. Simon explained that most houses built before 1950 "would most likely contain lead-based paint . . . unless proven negative by testing."

7

based.[7] Home Equity asserted that Dr. Simon's assertions "flatly contradict" Mr. Rogers' burden of proving all facts essential to the cause of action, and Mr. Rogers had "put forth no affirmative evidence to show that lead paint at the Towanda Property – and not at some other property – caused his alleged injuries."

On December 29, 2014, Mr. Rogers filed a response to Home Equity's motion for summary judgment, asserting that he presented both

> direct and circumstantial evidence of the existence of lead-based paint at [the Towanda Property] as well as expert toxicological and medical testimony opining that there was more likely than not lead-based paint exposure at [the Towanda Property] and that [he] was injured as [a] result of that exposure.

Mr. Rogers stated that he was not required to present direct evidence, "by way of interior testing," to prove that his blood lead levels were caused by exposure to lead at the Towanda Property because there was evidence of deteriorated paint located in areas that were easily accessible to him at the property during his tenancy, and he experienced his "highest elevated blood lead levels while living" at the property. He stated that he "had access to areas with chipping and flaking paint and was seen mouthing windowsills that tested positive for lead-based paint in 1976," and he was not required to "rule out all possible sources of lead" exposure because there "can be multiple causes of injury."

---

[7] On October 7, 2014, when Dr. Simon issued his report, Arc had not yet issued a report of its findings from the exterior testing of the Towanda Property. After receiving a copy of the Arc report relating to the finding of lead on the exterior of the Towanda Property, Dr. Simon issued an addendum to his report, restating his previous conclusion that the Towanda Property was a substantial contributing source of Mr. Rogers' alleged injuries.

In addition to Dr. Simon's report indicating that the Towanda Property was a substantial source of Mr. Rogers' lead exposure, Mr. Rogers attached an October 24, 2014, report from his medical expert, Dr. Jeanette R. McDaniel, in which she concluded that, based on the age of the property, the condition of the property during Mr. Rogers' residency as described by Ms. Rogers-Coy, the home visit conducted by the BCHD in 1997, Mr. Rogers' blood lead levels, his age and risk factors, the 1976 positive lead-testing of the property, the 2014 Arc testing, and the absence of gut rehabilitation, Mr. Rogers was exposed to lead at the Towanda Property. Mr. Rogers argued that, because he lived at the Towanda Property for six months, had access to areas of deteriorated paint at the property, and had his "highest sustaining elevated blood lead levels while he lived at the property," the evidence was sufficient for a trier of fact to conclude that the Towanda Property was a substantial contributing source of his lead exposure.

In opining that Mr. Rogers' exposure to lead at the Towanda Property was a "substantial contributing factor to his elevated lead levels," Dr. McDaniel stated that "Chinquapin may have also contributed to his exposure but to a lesser degree."[8] She concluded that Mr. Rogers "sustained injuries to his central nervous system from his lead exposure." Although he was functioning in society and school, "his test scores and his ADHD as well as his executive function and working memory skills may have been affected by his lead exposure."

---

[8] At her deposition, Dr. McDaniel agreed that 6149 Chinquapin "was a source of exposure."

Dr. McDaniel stated that it typically takes 30-45 days after lead ingestion for blood lead levels to increase, and it takes the same amount of time for blood lead levels to decrease. She agreed that, if Mr. Rogers began living in the Towanda Property on January 1, 1997, a blood draw on January 8, 1997 could not be a result of exposure at Towanda, but rather, it "would probably be more a reflection on where he left."[9] She also agreed that, because the previous blood lead level he had was 14 µg/dL in March 1996, it was possible that Mr. Rogers' 21µg/dL blood lead level in January 1997 reflected a decrease in blood lead levels from what it was before he moved into the Towanda Property. She further testified that an increase in blood lead level from 14 µg/dL to 21 µg/dL did not change the impact of Mr. Rogers' injuries, but rather, the numbers were "just a reflection of his exposure of the lead load – lead load level – lead load at that residence, so he's still suffering the same damages."

On January 23, 2015, the court held a hearing. Home Equity argued that it was entitled to summary judgment on two bases: (1) there was no evidence of medical causation; and (2) Mr. Rogers could not eliminate other sources of exposure to lead-based paint. With respect to causation, Home Equity argued that Mr. Rogers had not established that the increase in his blood lead levels were substantial enough to contribute to his injuries, noting that Dr. McDaniel testified that the increase in blood lead level from 14 µg/dL to 21 µg/dL did not change the impact of Mr. Rogers' injuries.

---

[9] The transcript states July, but in context, it is clear that the reference was to January 8, 1997.

With respect to Mr. Rogers' inability to eliminate other sources of lead paint exposure, counsel argued that there was direct evidence of lead-based paint at 6149 Chinquapin, but there was no direct evidence of any lead-based paint in the interior of the Towanda Property. To "connect the dots between a defendant's property and plaintiff's exposure to lead" in a lead exposure case involving circumstantial evidence, a plaintiff must "rule out other reasonably probable sources" of lead exposure, which Mr. Rogers had not done, given the testimony that the Chinquapin property was a source of his lead exposure.

Counsel for Mr. Rogers argued that the evidence showed that Mr. Rogers lived at the Towanda Property from October 1996 through April 1997, a period of approximately six months, and Dr. McDaniel opined that Mr. Rogers' blood lead levels of 21µg/dL were attributable, to a substantial degree, to his residence at the property. Mr. Rogers asserted that there was "direct evidence of lead in the interior of the property" based on the 1976 lead testing and the lack of subsequent records showing "gut rehabilitation or significant rehab of the house." Thus, he argued, the "same components that were tested positive with lead in 1976 were still there" during Mr. Rogers' tenancy at the property. Moreover, in March 1997, the house was in a dilapidated condition, Mr. Rogers was seen chewing on the windowsills, and his blood lead levels were elevated. Counsel stated that Mr. Rogers did not dispute that other properties contributed to his elevated blood lead levels, but he asserted that the evidence indicated that the Towanda Property was a "direct, actual, substantial contributing factor of those blood lead levels." And recent testing of the Towanda Property showed "multiple areas of lead on the exterior of the property."

11

At the conclusion of the hearing, the court granted Home Equity's motion for summary judgment. Initially, it noted that it rejected Home Equity's argument that Mr. Rogers could not prove medical causation "because of Dr. McDaniel's testimony that the level of 21, as opposed to 14, did not cause any additional injury to Mr. Rogers." The court explained:

> I'm aware from other cases with testimony concerning cumulative levels and increased levels, and in addition, I think that the testimony at deposition of Dr. McDaniel is not conclusive. There is the reference . . . suggesting that she would attribute additional injury to the higher level. And while there's certainly grist for cross-examination in her later statement as well, I don't find that that creates an undisputed state of facts that warrant summary judgment on that argument.

The court than addressed Home Equity's second argument, that there was "insufficient evidence of the presence of lead paint as a source of exposure for Mr. Rogers in the Towanda Road property." With regard to that contention, the court concluded "that the Plaintiffs in this case do not have sufficient evidence to proceed on those issues of source and source causation." The court explained:

> The Plaintiffs in this case explicitly disavow any reliance on [*Dow v. L & R Properties*, 144 Md. App. 67 (2002)] in a purely circumstantial theory[,] emphasizing the evidence that they have that a lead-paint hazard was present in this property in the mid 1970s. That certainly is evidence that the Plaintiffs can use, and I agree with Plaintiffs that that moves the ball beyond any presumption from the age of the house to actual evidence that lead paint existed in the house at one point. But I think the causal dots that are not connected for the Plaintiff's case are then the supporting evidence from which a jury could conclude that the same lead paint, which was present in the house in 1976 or the mid 1970s, remained in the house in 1996 and 1997 when Mr. Rogers was allegedly exposed.[10]

_____

[10] During the hearing, the court repeatedly asked Mr. Rogers' counsel how evidence of lead in the interior of the residence in 1976 supported an inference that there was lead in the interior in 1996, noting that Mr. Rogers had the burden to (continued . . .)

12

And I think the Plaintiff would have to rely on some other circumstantial theory to support those issues concerning the actual exposure in – alleged exposure in the 1990s. Because they've disavowed any reliance on Dow, and because their experts have not purported to exclude other sources or circumstantially demonstrate that the Towanda Road property was the source of both lead exposure and the elevated levels measured in 1997, I will grant summary judgment for this Defendant on that issue.

Following the hearing, the court issued an order granting Home Equity's motion.

On February 2, 2015, Mr. Rogers filed a motion for reconsideration. In his Motion for Reconsideration, Mr. Rogers argued, *inter alia*, that an inspection certificate filed by the owner of the Towanda Property in 2007 indicated that the property was not free of lead paint, showing that the lead paint found in 1976 had not been removed. He attached an inspection certificate issued by the Maryland Department of the Environment, which included the following five categories: (1) Lead Free; (2) Full Risk Reduction; (3) Modified Risk Reduction; (4) Lead Safe Qualified Offer; and Lead Safe not Qualified Offer. The inspector checked the category "Full Risk Reduction." A Full Risk Reduction certificate indicates that there is a reduced risk of lead exposure in a rental unit, and this standard is met by "passing the test for lead-contaminated dust, provided that that any chipping peeling, or flaking paint has been removed or repainted on interior and exterior of the rental dwelling unit." Maryland Department of the Environment, *Lead Poisoning Prevention Program: Lead Paint Certificates for Rental Housing* (Rev. Jan. 2015). https://perma.cc/AAQ5-UHHP.

---

(. . . continued) produce evidence of lead in the premises when he lived there, and the law did not permit a presumption that once there was lead in the house it remained, unless the defendant rebutted the presumption with evidence that it was gone. The court stated that Mr. Rogers had the burden to show that the lead paint was not removed.

13

In its opposition, Home Equity argued that this exhibit was "previously admissible as evidence," but Mr. Rogers chose not to admit it, and reconsideration of summary judgment was not merited. On March 31, 2015, the circuit court issued an order declining to reconsider its decision.

**STANDARD OF REVIEW**

Maryland Rule 2-501(f) governs motions for summary judgment and provides that a trial court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." *Accord Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 67 (2010). A determination "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Tyler v. City of College Park*, 415 Md. 475, 498 (2010). Thus, the standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo*. *D'Aoust v. Diamond*, 424 Md. 549, 574 (2012).

When we consider a circuit court's order granting summary judgment, we "review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Rhoads v. Sommer*, 401 Md. 131, 148 (2007). *Accord Reiter*, 417 Md. at 67 ("'[W]e independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.'") (quoting *Livesay v. Baltimore County*, 384 Md. 1, 10 (2004)). We review "the same information from the record and decide[] the same issues of law as the trial court." *Heat & Power*

14

*Corp. v. Air Prods & Chem., Inc.*, 320 Md. 584, 591-92 (1990). If the facts in the record "'are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper.'" *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 72 (2006) (quoting *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 533 (2003)).

"'[T]he purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried.'" *Id.* (quoting *Sadler*, 378 Md. at 534). For summary judgment purposes, "'[a] material fact is a fact the resolution of which will somehow affect the outcome of the case.'" *Pence v. Norwest Bank Minn., N.A.*, 363 Md. 267, 279 (2001) (citation omitted). "'[T]he mere existence of a scintilla of evidence in support of the plaintiffs' claim is insufficient to preclude the grant of summary judgment; there must be evidence upon which the jury could reasonably find for the plaintiff.'" *Crickenberger v. Hyundai Motor America*, 404 Md. 37, 45 (2008) (quoting *Beatty v. Trailmaster Prods, Inc.*, 330 Md. 726, 738-39 (1993)). "[W]hile a court must resolve all inferences in favor of the party opposing summary judgment, those inferences must be reasonable ones.'" *Id.* (quoting *Beatty*, 330 Md. at 739).

Generally, we limit our review to the grounds relied upon by the trial court. *Benway v. Maryland Port Admin.*, 191 Md. App. 22, 46 (2010). *Accord PaineWebber Inc. v. East*, 363 Md. 408, 422 (2001) ("In appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment."). We may, however, affirm the grant of

summary judgment on a ground not relied upon by the circuit court if "the alternative ground is one upon which the circuit court would have no discretion to deny summary judgment." *Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 635 (2009) (quoting *Dixon v. Dep't of Pub. Safety & Corr. Servs.*, 175 Md. App. 384, 418 n. 19 (2007)), *cert. denied*, 414 Md. 332 (2010).

## DISCUSSION

Mr. Rogers contends that the circuit court erred in granting Home Equity's motion for summary judgment on the ground that he had not presented sufficient evidence that the Towanda Property was the source of his lead exposure or his elevated blood lead levels. In support, he states:

> [Mr. Rogers] put forth direct evidence of the existence of lead-based paint in the house in 1976, and evidence that the original lead paint components that were dilapidated and contained many layers of old deteriorated paint remained in the house during [his] residency. [He] has also put forth evidence of building and renovation permits establishing a reasonable inference that there was no lead abatement or removal of all the leaded components prior to 1996. Absent evidence of complete lead abatement to *contradict* these facts, [he] has put forth sufficient evidence for a jury to logically infer the likely existence of lead-base[d] paint during his residency in 1996-97.

Mr. Rogers asserts that, based on the "totality of the facts, a fact finder could reasonably infer the existence of deteriorate[d] lead-based paint at the [Towanda Property] that substantially contributed to [his] lead exposure, elevated blood lead levels and resulting injuries." He lists those facts as follows:

> 1) the house was an older house built in 1920 at a time when 95 percent of homes contained lead-based paint; 2) the home was found to contain lead paint throughout the interior in 1976; 3) these lead paint components were not completely abated in 1976; 4) the home was found to contain lead paint

16

in 2014 on the exterior porch and adjacent exterior window where [he] spent significant time; 5) [t]he house contained many areas of deteriorated paint in the interior and exterior during [his] residency and these areas match areas found to contain lead-based paint; 6) [he] had frequent hand to mouth activity, and mouthed the windows in the home . . . ; 7) [he] was of a tender age when he spent all of his time in the home containing deteriorated paint; 8) [he] had his highest sustained elevated blood lead levels while residing at [the Towanda Property], that increased rather than declined as would be expected if he were removed from a lead paint source; 9) [t]he home was not certified lead free by a Maryland Department of the Environment certified inspector in 2007; 10) there is no evidence in the record that the home was gut renovated prior to residency, and to the contrary, the home was described as old, dilapidated and condemned; 11) the windows in the home were original to the home and not replacement windows during [Mr. Rogers'] residency; 12) [t]here is no evidence in the record, other than pure speculation, that [Mr. Rogers] was exposed to any other probable sources of exposure while residing at [the Towanda Property].

Accordingly, he concludes, "it was improper for the trial court to grant summary judgment and deny the motion for reconsideration."[11]

Home Equity responds that the circuit court properly granted summary judgment in its favor because Mr. Rogers did not put forth sufficient evidence that the Towanda Property proximately caused his alleged injuries. It asserts that Mr. Rogers failed to "demonstrate the presence of lead at the Towanda Property, let alone his exposure to lead there or any additional injury from such exposure," and therefore, he could not "establish that the Towanda Property proximately caused his injuries." Home Equity contends that a "[p]laintiff cannot create a genuine dispute of material fact by pointing to the presence of lead paint that was detected and remediated twenty years prior to his alleged residence at

---

[11] Mr. Rogers does not make any argument of error in denying the motion for reconsideration that is different from the argument of error in denying the motion for summary judgment. Thus, we will focus our analysis on the initial ruling granting the motion for summary judgment.

17

the Towanda Property, especially where renovation, repair, and repainting took place in the intervening decades." It asserts that Mr. Rogers "seeks to invert the burden of proof," arguing that he should be able to submit his claim to a jury unless Home Equity can show "by testimony, or other evidence" that the lead paint discovered in the Towanda Property in 1976 had been remediated, a standard not supported by Maryland law. In any event, it asserts that the record shows that the lead paint found in 1976 was abated.

Additionally, Home Equity asserts that the Arc report showing lead paint on the exterior of the Towanda Property in 2014 does not "save [Mr. Rogers] from the lack of causation evidence." It contends that "[m]erely testing the exterior of a home is not sufficient to establish that the home was a substantial contributing source of . . . alleged lead exposure." Moreover, it argues that, to the extent that Mr. Rogers argues on appeal that he was exposed to lead paint while spending time on the front porch, this argument is not properly before this Court because it was not raised in or decided by the trial court. In any event, it asserts, there is "no evidence that [Mr. Rogers] engaged in any hand-to-mouth activity on the porch . . . or that [he] otherwise ingested paint from the outside of the home." Thus, "[t]o the extent [Mr. Roger's] new theory is even plausible, he failed to develop sufficient facts to support it."

Home Equity further argues that, even if Mr. Rogers could show the presence of lead at the property, "he lacks sufficient evidence to submit to a jury the question of whether this lead caused him harm because he cannot eliminate other properties as the source of his exposure." In that regard, it asserts that Dr. Simon "conceded that there existed at least one other substantial contributing factor to [Mr. Rogers'] lead exposure

18

before he lived at the Towanda Property." In sum, Home Equity argues that, because Mr. Rogers cannot "put forth sufficient evidence to show the presence of deteriorated lead paint at the Towanda Property during his residence there," and he cannot show that the Towanda Property, and not some other property, caused his alleged injuries, summary judgment was proper. [12]

A plaintiff alleging negligence has the burden of proving "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016). *Accord Taylor v. Fishkind,* 207 Md. App. 121, 148 (2012), *cert. denied*, 431 Md. 221 (2013). Where a plaintiff bases his negligence claim on an alleged violation of a statute or ordinance governing lead paint, the plaintiff must prove "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the

---

[12] Home Equity further argues that, if this Court concludes that Mr. Rogers did present a question of material fact regarding the presence of deteriorated lead paint at the Towanda Property and link that lead paint to his elevated blood lead levels, his "claim still fails as a matter of law because [he] lacks evidence to link his alleged harm to any increased blood lead levels he attributes to the Towanda Property." It asserts that Mr. Rogers' sole medical expert, Dr. McDaniel, testified that she did not have sufficient evidence to conclude that an increase in blood lead level from 14 µg/dL to 21 µg/dL necessarily resulted in greater injury to Mr. Rogers. That testimony, argues Home Equity, "show[s] that [her] opinion is insufficient to link [Mr. Rogers'] alleged exposure at the Towanda Property to any injury over and above what he already sustained." Therefore, Home Equity asserts, even if Mr. Rogers "could show the presence of lead hazards at the Towanda Property and link these lead hazards to an increased blood lead level, he cannot link his blood lead levels during the alleged time period of his residence to any additional or separate injury." Based on our resolution of this case, we need not address Home Equity's argument in this regard.

plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 79 (2003).

Although not specifically identified in the complaint, we presume that Mr. Rogers premised his negligence action on the Housing Code of Baltimore City (1997), Art. 13 §§ 702-703, 706 ("Housing Code"). Section 702 requires that "[e]very building . . . occupied as a dwelling shall . . . be kept in good repair, in safe condition, and fit for human habitation." Section 703 provides, in relevant part, that "[g]ood repair and safe condition shall include . . . the following standards; . . . [a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint." Section 706 requires that "[a]ll interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition," and that "[n]o paint shall be used for interior painting of any dwelling, dwelling unit, rooming house or rooming unit unless the paint is free from any lead pigment."

If the plaintiff satisfies the first prong of the claim, the violation of a statute or ordinance, he or she still must show that violation proximately caused his or her injury. *Brooks*, 378 Md. at 79. "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (quoting *Hartford Ins. Co v. Manor Inn*, 335 Md. 135, 156-57 (1994)).

The circuit court here granted summary judgment on the ground that Mr. Rogers had not produced evidence that any negligence by Home Equity was the "cause in fact" of Mr. Rogers' injuries. "Causation-in-fact concerns the threshold inquiry of 'whether defendant's conduct actually produced an injury.'" *Id.* at 244 (quoting *Peterson*, 258 Md.

20

at 16-17). *Accord Kiriakos v. Phillips*, ___ Md. ___, No. 20, Sept. Term 2015, slip op. at 20 (filed July 5, 2016). When, as here, there may be two or more independent negligent acts bringing about an injury, "causation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Pittway*, 409 Md. at 244.

The Court of Appeals has explained the evidence necessary to establish causation in a lead-based paint case, as follows:

> To connect the dots between a defendant's property and a plaintiff's exposure to lead, the plaintiff must tender facts admissible in evidence that, if believed, establish two separate inferences: (1) that the property contained lead-based paint, and (2) that the lead-based paint at the subject property was a substantial contributor to the victim's exposure to lead. At times, these separate inferences may be drawn from the same set of facts, but parties would do well to remember that these inferences are separate and often will require different evidentiary support.

*Hamilton v. Kirson*, 439 Md. 501, 529-30 (2014).

A plaintiff may show causation through either direct or circumstantial evidence. *Id.* at 527. Circumstantial evidence may satisfy the plaintiff's burden of proof if it demonstrates that the property is a reasonable probable source of lead exposure. *Rowhouses*, 446 Md. at 654-57. The evidence is sufficient if it "'creates a reasonable likelihood or probability rather than a possibility supporting a rational inference of causation, and is not wholly speculative.'" *Hamilton*, 439 Md. at 529 (quoting *West v. Rochkind*, 212 Md. App. 164, 170-71 (2013)). In other words, the plaintiff must show that "there is a fair likelihood that the subject property contained lead-based paint and was a source of the lead exposure." *Rowhouses*, 446 Md. at 657-59.

Causation in a lead paint case involves "a series of links: (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels[;] and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff." *Hamilton*, 439 Md. at 529 (quoting *Ross v. Housing Auth. of Baltimore City*, 430 Md. 648, 668 (2013)). Thus, to be a substantial factor in causing a plaintiff's alleged injuries, the home in question must have been a source of the plaintiff's exposure to lead, the "exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to [plaintiff's] injuries." *Id.*

Here, with respect to the first link, Mr. Rogers contends that he had both direct and circumstantial evidence showing that the Towanda Property was a reasonable probable source of his lead exposure. Although there was no testing of the residence during the time that he lived there, Mr. Rogers asserts that there was direct evidence that the Towanda Property contained lead-based paint in the interior of the home in 1976, which he asserts "was not completely removed based on the abatement standard in effect during that time, and direct evidence of lead-based paint still remaining in 2014 on the exterior porch and windows."

Home Equity argues, and the circuit court found, that evidence of the existence of lead paint in the residence in 1976 was not "direct evidence" of the presence of lead paint during Mr. Rogers' residency, 20 years later. We agree.

In *State v. Smith*, 374 Md. 527, 547 n.8 (2003), the Court of Appeals defined "direct evidence" as "'[e]vidence, which if believed, proves existence of fact in issue without

22

inference or presumption.'" (quoting Black's Law Dictionary 461 (6th ed. 1990)).

Evidence of the presence of lead paint in the Towanda Property in 1976 is not direct evidence of lead paint in the property in 1996-97. As the circuit court noted, Mr. Rogers' theory requires a fact finder to presume the presence of lead paint in 1996-97 in the absence of specific evidence that the lead paint found in 1976 was removed. To allow Mr. Rogers to go to the jury on the argument that, because the house contained lead paint at one time, 20 years earlier, and "[n]o one has ever determined" that the interior was lead-free after that time, would ignore Mr. Rogers' burden to show a reasonable probability, not a possibility, that lead paint existed at the property during the time he lived there.

We agree with the circuit court that evidence of lead paint in the house 20 years before Mr. Rogers resided there is not direct evidence of lead paint in the property during his residency, and it is not sufficient to satisfy Mr. Rogers' burden and get the case to the jury. Although it may establish a "possibility" of causation, it does not satisfy Mr. Rogers' burden to show that the Towanda Property was a "reasonable probable source" of his lead exposure. *Rowhouses*, 446 Md. at 654-57.

That is not to say that this evidence could not be considered, with other evidence, as circumstantial evidence showing that the Towanda Property was a reasonable probable source of lead exposure. Mr. Rogers argues that there was such evidence, citing to evidence that he asserts provided an inference that lead remained in home during his residency, such as the "lack of evidence of any gut renovations" prior to his residency and the evidence that, during his tenancy, the original windows remained, the property was dilapidated, as well as evidence that lead paint was found on the exterior porch in 2014.

23

Home Equity disagrees. It argues that Mr. Rogers "cannot put forth sufficient evidence to support his proposed inferences that deteriorated lead paint remained at the Towanda Property after the 1976 Abatement and that further repair work did not take place," noting that the record reflects that the Towanda Property had significant renovations during the 20 years after the 1976 finding that lead was present, an abatement card was issued in 1976, and the Baltimore City Code in effect in 1976 required the removal of lead paint.

Because Home Equity relies heavily on the abatement card issued in 1976, we address that issue first. In Dr. Simon's report, admitted below, Dr. Simon stated that the abatement in 1976 was a limited abatement, which corrected the flaking paint found, but did not address other areas that tested positive for lead paint. Although Home Equity did not challenge this conclusion below, in this Court, Home Equity asserted that the issuance of the abatement card established as a matter of law that all lead paint was removed from the Property because an abatement, under the law at that time, required the removal of all interior lead paint. Our review of the Baltimore City Code in effect in 1976, Art. 13 §§ 703, 703, reveals a requirement that all peeling or flaking paint be removed, and that no new painting be done with lead-based paint. We did not find, however, a requirement to remove all lead-based paint, as Home Equity alleges, even if it was not flaking or peeling. Similarly, Md. Code (1976 Supp.), Art. 43, § 117A, permitting tenants to put rent in escrow if a landlord failed to remove lead paint from surfaces *easily accessible* to children, did not require the removal of all lead-based paint, but merely removal from surfaces easily accessible to children. On the record presented here, we are not persuaded that the mere

24

existence of the abatement card shows, as a matter of law, that there was a "full abatement" in 1976, as opposed to a "limited abatement," as Dr. Simon opined.

Although the abatement in 1976 does not resolve the issue, that is not the end of the inquiry. As indicated, Mr. Rogers has the burden to show that it was reasonably probable that lead-based paint found in 1976 still existed during his residency at the Towanda Property 20 years later, and this lead paint substantially contributed to his lead exposure, his elevated blood lead levels, and his injuries. We need not resolve whether Mr. Rogers met his burden in this regard because, even assuming, *arguendo*, that the other evidence was sufficient to create an inference that the Towanda Property contained lead-based paint in 1996-97, we conclude that the circuit court properly granted summary judgment on the ground that Mr. Rogers has not adequately demonstrated "that the Towanda Road property was the source of both lead exposure and the elevated levels measured in 1997."

In this regard, Mr. Rogers asserts that he presented evidence that he "had his highest sustained elevated blood lead levels while residing at [the Towanda Property], that increased rather than declined as would be expected if he were removed from a lead paint source." Although the record does support his assertion that his blood lead levels were highest at the Towanda Property, the record does not support his assertion that his blood lead levels increased after moving to the Towanda Property.

With respect to the lead levels at various residences, the record, viewed in the light most favorable to Mr. Rogers, reveals the following:

25

| Date | Blood Lead Level | Address |
|---|---|---|
| 06/29/1995 | 7 µg/dL | 6149 Chinquapin Parkway |
| 03/25/1996 | 14 µg/dL | |
| October 1996 | | 3738 Towanda Avenue |
| 01/08/1997 | 21 µg/dL | |
| 03/26/1997 | 20-21 µg/dL | |
| April 1997 | | 2534 Loyola Northway |
| 04/30/1997 | 17-18 µg/dL | |
| 08/22/1997 | 13 µg/dL | |

As the chart reflects, Mr. Rogers' blood lead level was elevated, at 14 µg/dL, on March 25, 1996, before he moved to the Towanda Property. Given this evidence of Mr. Rogers' elevated blood lead level when he lived at 6149 Chinquapin Parkway, Mr. Rogers' expert, Dr. McDaniel, agreed that Chinquapin was a source of Mr. Rogers' lead exposure. She also testified that there were no additional blood tests before January 8, 1997, approximately 10 months later, and because there were no blood tests administered before Mr. Rogers moved to the Towanda Property in October 1996, the 21 µg/dL blood lead level recorded on January 8, 1997, could reflect a decrease in his blood lead levels from what it was before he moved into the Towanda Property. Under these circumstances, the record does not reflect, as Mr. Rogers asserts, evidence that his blood lead levels increased while he was residing at the Towanda Property.

Given this evidence, Mr. Rogers did not produce evidence that created a reasonable probability that he was exposed to lead at the Towanda Property that caused his alleged lead-exposure injuries. Although his factual allegations supported a *possibility* that he was

26

exposed to lead there, he did not show a reasonable probability that the Towanda Property was a substantial contributor to his elevated blood lead levels. Accordingly, the circuit court properly granted summary judgment in favor of Home Equity.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**