*Terrence Rogers v. Home Equity USA, Inc.*, No. 57, September Term, 2016, Opinion by Adkins, J.

**NEGLIGENCE — LEAD-BASED PAINT — SOURCE OF LEAD EXPOSURE:** Petitioner established that the subject property was a reasonably probable source of his lead exposure when he put forth evidence that the home contained lead-based paint 20 years prior to his residence, the paint was not fully abated before Petitioner moved in, he demonstrated elevated blood lead levels while living there, and he spent all of his time in the home while he resided there. Petitioner's use of circumstantial evidence did not require him to rule out a previous residence as a possible source of his lead exposure. Accordingly, summary judgment was improperly granted as to source.

**NEGLIGENCE — LEAD-BASED PAINT — SOURCE CAUSATION:** Petitioner established a reasonable probability that lead-based paint in the subject property caused his elevated blood lead levels when his levels were elevated throughout his residence at the property, his lead level declined after he moved out, and a Baltimore City Health Department caseworker observed him mouthing paint chips in the property. Petitioner was not required to demonstrate that his lead level increased when he moved to the subject property to establish the property as a reasonably probable cause of his elevated blood lead levels. Accordingly, summary judgment was improperly granted as to source causation.

Circuit Court for Baltimore City
Case No.: 24-C-13-003480
Argued: February 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

---

No. 57

September Term, 2016

---

TERRENCE ROGERS

v.

HOME EQUITY USA, INC.

---

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

---

Opinion by Adkins, J.
Watts, J., concurs.
Getty, J., dissents.

---

Filed: May 30, 2017

Difficulties of proof abound in lead paint cases, and this case is no exception. Petitioner Terrence Rogers alleges that he was poisoned by lead-based paint as a toddler when he lived in a row house owned by the Respondent Home Equity USA, Inc. ("Home Equity"). The property tested positive for lead-based paint throughout its interior in 1976—20 years before Rogers lived there. To survive summary judgment, a plaintiff must establish the subject property as a "reasonably probable source" of his lead poisoning. We are faced with the question of whether—without ruling out other possible sources of exposure—the 1976 testing, combined with other circumstantial evidence, clears that bar for Rogers.

## FACTS AND LEGAL PROCEEDINGS

Terrence Rogers was born on February 28, 1994. For the first few months of his life, Rogers lived at 2328 Nevada Street in Baltimore City. In April 1994, Rogers and his mother, Toni Rogers-Coy, moved to 6149 Chinquapin Parkway ("Chinquapin"), where they lived for over two years. In October 1996, they moved to 3738 Towanda Avenue ("Towanda"), a row house in northwest Baltimore and the subject property in this case.[1] After about six months, Rogers and his mother moved to 2534 Loyola Northway

---

[1] Before the trial court, Home Equity USA, Inc. ("Home Equity") argued that Terrence Rogers did not move to 3738 Towanda Avenue ("Towanda") until January 1997 and that he admitted this fact through his failure to respond to requests for admissions. But during oral argument before this Court, Home Equity, through counsel, accepted Rogers' move-in date as October 1996 for the purposes of summary judgment.

("Loyola").[2] In the first four years of his life, Rogers' blood lead level was tested six times, with the following results:

| Date | Age | Blood Lead Level[3] | Property |
|---|---|---|---|
| June 29, 1995 | 1 year, 4 months | 7 µg/dL | Chinquapin |
| March 25, 1996 | 2 years, 1 month | 14 µg/dL | Chinquapin |
| January 8, 1997 | 2 years, 10 months | 21 µg/dL | Towanda |
| March 26, 1997 | 3 years, 1 month | 20–21 µg/dL | Towanda |
| April 30, 1997 | 3 years, 2 months | 17–18 µg/dL | Loyola |
| August 22, 1997 | 3 years, 6 months | 13 µg/dL | Loyola |

Before the trial court, Rogers presented evidence regarding the history of Towanda, which was owned by Home Equity while he lived there. Towanda was built in 1920, when 95 percent of homes contained lead-based paint. In 1976, the Baltimore City Health Department ("the Health Department") conducted an investigation of Towanda after a child who had lived there since birth exhibited elevated blood lead levels. Lead testing detected lead-based paint on 19 surfaces throughout the interior of the home and flaking paint on an additional seven surfaces. In October 1976, the Health Department issued an abatement card indicating that the flaking paint had been corrected. Thirteen years later, in 1989, Towanda was again referred to the Health Department because a child who lived there

---

[2] The exact date Rogers moved out of Towanda is unknown. Rogers' mother, Toni Rogers-Coy, testified that they moved out of Towanda around April 1997. Records from Kennedy Krieger's Lead Poisoning Prevention Clinic indicate that Rogers-Coy and her son moved out of Towanda on March 29, 1997. After a home visit on March 17, 1997, the Baltimore City Health Department noted that Rogers-Coy "must move by end of week," which was March 21, 1997.

[3] Blood lead is measured in micrograms per deciliter ("µg/dL").

demonstrated elevated blood lead levels. The Health Department did not re-inspect the home, however, because the family moved shortly after the referral.

Between 1976 and 1996, the Baltimore Department of Housing and Community Development ("DHCD") issued various building permits for construction projects at Towanda, but none described lead abatement. In 1979, the DHCD issued a permit to install a new gas boiler. In 1983, Towanda was permitted for roofing and carpentry work, plumbing repairs, and painting. Lastly, in 1994, the DHCD authorized $19,000 worth of construction to re-stucco a side wall and repair the first- and second-floor rear decks. In 2006, nine years after Rogers moved out of Towanda, the DHCD issued a permit to replace Towanda's windows.

When Rogers' January 8, 1997 blood test indicated a lead level of 21 µg/dL, the Maryland State Laboratory referred his case to the Health Department's Childhood Lead Poisoning Prevention Program. A Health Department caseworker visited Towanda on March 17, 1997 and noted that the home was in a "very dilapidated condition." She also observed Rogers mouthing the windowsills and reported that the property contained flaking paint "all over." After her home visit, the caseworker described the home as "condemned" and directed Rogers-Coy to move within a week. The caseworker also noted that Towanda was a suspected source of Rogers' lead exposure.

After the same January 8, 1997 blood lead test, Rogers' health care provider, South Baltimore Family Health Center, referred him to the Kennedy Krieger Institute Lead Poisoning Prevention Clinic ("Kennedy Krieger"). In an intake interview with Kennedy Krieger on March 26, 1997, Rogers-Coy reported flaking paint on the ceiling, walls, and

3

window frames at Towanda. She indicated that the home did not appear to be renovated and that the windows looked as if they were original to the property. She also stated that Rogers spent all of his time at Towanda, playing either inside or outside of the house. During her deposition, Rogers-Coy testified that the windows and porch at Towanda had layers of chipping and flaking paint. She also testified that she often sat on the porch with Rogers when they lived there.

On May 29, 2013, Rogers filed a complaint in the Circuit Court for Baltimore City against Home Equity for negligence and unfair trade practices in violation of the Maryland Consumer Protection Act.[4] Rogers alleged that he was exposed to lead while he lived at Towanda and suffered permanent brain damage as a result. He claimed that he has undergone extensive medical treatment and will suffer "substantial" loss of wages as a result of his injuries. Rogers requested damages "in excess of $75,000," plus costs, for each claim. Home Equity filed its answer on February 12, 2014, and the parties entered discovery.

In October 2014, Arc Environmental, Inc. ("Arc") conducted lead testing on the exterior of Towanda. The testing found lead-based paint on the front porch, front door frame, and one exterior window. The same month, Robert K. Simon, Ph.D., a lead risk assessor and environmental toxicologist, provided a report concluding that Towanda was

---

[4] Rogers also filed suit against the owners of 6149 Chinquapin Parkway ("Chinquapin") and the realty company that managed that property. In June 2014, the court dismissed Rogers' claims against the realty company due to a lack of jurisdiction. In October 2014, Rogers' claims against Chinquapin's owners were voluntarily dismissed without prejudice.

a "substantial contributing source of [Rogers'] lead exposure and lead poisoning during his early childhood." To reach this conclusion, Dr. Simon relied upon a variety of documents, including deposition testimony from Rogers-Coy, Rogers' blood lead tests, the Arc testing, and residential information collected by the Health Department, Kennedy Krieger, and the DHCD.

Jeanette R. McDaniel, M.D., a pediatrician, also filed a report concluding that Towanda was a substantial contributing factor to Rogers' elevated blood lead levels. She opined that Rogers' blood lead levels "rose substantially" while living at Towanda and then, as reflected in the test results, "dropped upon leaving the property." During her deposition, Dr. McDaniel testified that it takes 30 to 45 days for blood to reflect either an increase or decrease in lead exposure. Thus, she explained, Rogers' March 26, 1997 blood lead test reflected his exposure at Towanda even if he had moved out of the property a few days beforehand. Dr. McDaniel also testified that Rogers' April 30, 1997 blood test, which showed that his lead level dropped to 17–18 μg/dL one month after he moved out of Towanda, indicated to her that Towanda was a source of Rogers' lead exposure.

On December 8, 2014, Home Equity moved for summary judgment. In its motion, Home Equity argued that Rogers had not provided enough evidence to establish that Towanda was a source of his lead exposure or that any such exposure caused his elevated blood lead levels.[5] Home Equity claimed that to survive summary judgment on these two

---

[5] Home Equity also argued that Rogers lacked standing to bring his unfair trade practices claim. Rogers agreed that summary judgment should be entered for Home Equity on that claim.

issues—source and source causation—Rogers had to rule out all other possible sources of lead exposure. At the hearing on the motion, Home Equity also contended that Rogers did not have enough evidence to show that lead exposure at Towanda caused him medical injury. In other words, it argued that Rogers could not demonstrate medical causation.

The trial court rejected Home Equity's argument as to medical causation, but granted summary judgment on source and source causation. Although the 1976 lead testing was helpful, the court explained, Rogers did not have enough evidence "from which a jury could conclude that the same lead paint, which was present in the house in 1976 or the mid[-]1970s, remained in the house in 1996 and 1997 when [ ] Rogers was allegedly exposed." The trial court clarified that Rogers was not required to rule out other possible sources of lead exposure, but held that he had failed to otherwise provide enough circumstantial evidence for a jury to conclude that Towanda contributed to his elevated blood lead levels.

After the trial court granted summary judgment, Rogers filed a motion for reconsideration. He argued that a lead paint inspection conducted in 2007 revealed that Towanda still contained lead-based paint. Rogers attached a Lead Paint Risk Reduction Inspection Certificate from the Maryland Department of the Environment ("MDE"), which listed five categories for inspected homes, including "Lead Free" and "Full Risk Reduction." The inspector checked "Full Risk Reduction" for Towanda, which, Rogers argued, indicated that the home was not lead free. The trial court denied Rogers' motion for reconsideration, and he filed a timely appeal.

6

In a reported opinion, the Court of Special Appeals declined to decide whether Rogers had presented enough evidence that Towanda was a source of lead exposure and instead affirmed summary judgment on the issue of source causation alone. *Rogers v. Home Equity USA, Inc.*, 228 Md. App. 620, 644 (2016). The intermediate appellate court explained:

> [E]ven assuming, *arguendo*, that the other evidence was sufficient to create an inference that the Towanda Property contained lead-based paint in 1996–97, we conclude that the circuit court properly granted summary judgment on the ground that [ ] Rogers has not adequately demonstrated "that the Towanda Road property was the source of both lead exposure and the elevated levels measured in 1997."

*Id.* Because no blood lead tests were conducted between March 25, 1996 and January 8, 1997, the court observed that the January 1997 test "could reflect a decrease in [Rogers'] blood lead levels from what it was before he moved into the Towanda Property." *Id.* at 645. Thus, the court concluded that Rogers had not established a reasonable probability that lead at Towanda caused his elevated blood lead levels. *Id.* Rogers appealed.

He presented the following questions for our review:[6]

---

[6] We have consolidated the questions presented in Rogers' Petition for a Writ of Certiorari. His petition included the following questions:

> 1. Can a Maryland appellate court decline to resolve the correctness of the reasoning of the trial court when granting summary judgment, and then affirm the judgment relying on a different factual basis [than] relied upon by the trial court, if the trial court had discretion to deny summary judgment, the alternative basis required resolution of critical facts in dispute, and the appellate court rendered its decision without the benefit of a complete record?

2. Was it improper for the Court of Special Appeals to affirm the grant of summary judgment on a factual basis not relied upon by the trial court, when the factual support was first presented to the trial court by the Respondent during the hearing on summary judgment, not allowing Petitioner a proper amount of time to adequately ensure the record was factually complete as to this issue?

3. Was it improper for the Court of Special Appeals to affirm the grant of summary judgment relying upon a medical expert's opinion stated during her deposition, that in turn relied upon the resolution of a material fact in dispute, when the trial court did not rely upon this opinion as a reason for granting summary judgment, the issue could only be determined by resolving disputes of fact, and the court record only contained eleven non-consecutive pages of the doctor's deposition transcript, and did not reflect the medical doctor's entire causation opinion?

4. Was it error for the Court of Special Appeals to invade the province of the jury and make a determination of fact that the record "does not reflect, as [Rogers] asserts, evidence that his blood lead levels increased while he was residing at the Towanda Property[,]" when the record contains an abundance of evidence that the Towanda Property was a reasonably probable source of Petitioner's lead exposure and elevated blood lead levels, not relied upon or considered by the Court of Special Appeals when affirming the judgment?

5. Did the trial court err in granting Petitioner's Motion for Summary Judgment, and abuse the court's discretion in denying Petitioner's Motion for Reconsideration, on the ground that Petitioner failed to establish that the Towanda Property contained lead-based paint during Petitioner's residency in 1996 and 1997, despite evidence of a prior lead test for the property in 1976, and therefore, Petitioner failed to meet his burden of proof that the Towanda "property was the source of both lead exposure and the elevated levels measured in 1997"?

1. Did the trial court err in granting Home Equity's motion for summary judgment on the grounds that Rogers failed to establish Towanda as a reasonably probable source of his lead exposure?

2. Did the trial court err in granting Home Equity's motion for summary judgment on the grounds that Rogers failed to establish a reasonable probability that Towanda caused his elevated blood lead levels?

Because we answer both of these questions in the affirmative, we reverse the judgment of the Court of Special Appeals.

**STANDARD OF REVIEW**

Under the Maryland Rules, a court may grant summary judgment in favor of the moving party "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). In reviewing the grant of summary judgment, appellate courts ask whether it was legally correct without deference to the trial court. *Hamilton v. Kirson*, 439 Md. 501, 522 (2014) (citations omitted). We evaluate "the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party." *Id.* (citations omitted). To defeat a defendant's motion for summary judgment, the opposing party must present admissible evidence "upon which the jury could reasonably find for the plaintiff." *Id.* at 522–23 (citations omitted). Accordingly, "general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment." *Id.* at 522 (citations omitted).

DISCUSSION

Rogers argues that he has put forth sufficient evidence to survive summary judgment on both source and source causation. He contends that because he is not relying on a *Dow v. L & R Properties, Inc.*, 144 Md. App. 67 (2002), theory of causation, he is not required to rule out other possible sources of his lead exposure.[7] Home Equity responds that even if Rogers is not required to eliminate other possible sources of exposure, he has not demonstrated that it is probable—not merely possible—that Towanda caused his elevated blood lead levels.

Although not explicitly stated in his complaint, Rogers seems to have based his negligence claim upon a violation of the Housing Code of Baltimore City (1966, 1983 Repl. Vol.), §§ 702–03, 706 ("Housing Code"). Section 702 requires all occupied dwellings to "be kept in good repair, in safe condition, and fit for human habitation." Section 703(2)(c) provides that a dwelling is in "good repair" if, in relevant part, "[a]ll walls, ceilings, woodwork, doors and windows [are] kept clean and free of any flaking, loose or peeling paint." Section 706 provides that any "interior loose or peeling . . . paint shall be removed" and prohibits the use of lead-based paint in the interior of any dwelling. Under Maryland's common-law Statute or Ordinance Rule, Rogers can make out a *prima*

---

[7] Rogers also puts forth a number of procedural arguments regarding the Court of Special Appeals opinion. Rogers argues that the intermediate appellate court erred by: (1) affirming the trial court's grant of summary judgment on source causation rather than source; (2) relying on Dr. McDaniel's deposition testimony; (3) assuming Rogers' Towanda move-in date as undisputed fact; and (4) failing to remand the case for the trial court to develop the record. Because we reverse the Court of Special Appeals on other grounds, we decline to reach these arguments.

*facie* case of negligence based upon a violation of the Housing Code by demonstrating (1) the violation of a section of the Housing Code "designed to protect a specific class of persons which includes the plaintiff," and (2) "that the violation proximately caused the injury complained of." *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 79 (2003). In *Brooks v. Lewin Realty III*, we held that these provisions of the Housing Code were enacted to protect children from lead-based paint poisoning. *Id.* at 81 (citation omitted).

**Rogers' Burden of Proof**

To survive a motion for summary judgment, Rogers must produce enough evidence to satisfy both prongs of the Statute or Ordinance Rule to a reasonable probability. To satisfy the first prong, Rogers must demonstrate that it is reasonably probable that the subject property contained lead-based paint in violation of the Housing Code. To satisfy the second prong, he must establish that it is reasonably probable that the lead in the subject property caused his elevated blood lead levels, and that his elevated blood lead levels caused him injury. In *Ross v. Housing Authority of Baltimore City*, 430 Md. 648 (2013), we described this negligence theory as requiring three separate links: "(1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels[;] and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff." *Id.* at 668. For brevity, we will refer to these links as (1) source, (2) source causation, and (3) medical causation. In this case, only source and source causation are at issue.

To defeat a motion for summary judgment, a plaintiff must demonstrate only a reasonable probability as to each of these links—he is not required to conclusively establish

11

them.  *Dow*, 144 Md. App. at 75 (citing *Peterson v. Underwood*, 258 Md. 9, 17 (1970)).

In *Rowhouses, Inc. v. Smith*, 446 Md. 611 (2016), we sought to shed light on the meaning

of "reasonable probability."  We explained that "for purposes of causation in lead-based

paint cases at the summary judgment phase, a reasonable probability requires a showing

that is less than 'more likely than not,' but more than a mere 'possibility.'"  *Id.* at 655

(footnote omitted).  Additionally, "the subject property is a reasonable probable source of

a plaintiff's lead exposure where there is a **fair likelihood** that the subject property

contained lead-based paint and was a source of [ ] lead exposure."  *Id.* at 657 (emphasis

added).

Maryland appellate courts have recognized two ways in which a lead paint plaintiff

can establish the subject property as a reasonably probable source of his lead exposure and

resulting elevated blood lead levels.  First, in *Dow v. L & R Properties, Inc.*, the Court of

Special Appeals held that a plaintiff can defeat a motion for summary judgment by

presenting evidence that the subject property is the only possible source of the plaintiff's

lead exposure.  144 Md. App. at 75–76.  In other words, the plaintiff can present sufficient

evidence of source and source causation through the process of elimination.  The *Dow*

plaintiff lived in the subject property "from the time she was two months old until after she

was diagnosed" with lead poisoning.  *Id.* at 75.  The intermediate appellate court reasoned

that an affidavit indicating that the plaintiff spent all of her time in the home, "coupled with

the undisputed fact that homes built before 1950 often contain lead-based paint, could

indeed support an inference that the paint in question contained lead."  *Id.* at 76.  In

*Rowhouses*, we explained that under a *Dow* causation theory, circumstantial evidence, such

as testimony that prior residences did not contain flaking paint, is enough to rule out other possible sources of lead exposure. 446 Md. at 661–62.

Second, a plaintiff can survive summary judgment on the issues of source and source causation by presenting evidence related solely to the subject property. If there are multiple possible sources of lead exposure, he can put forth enough evidence to establish that it is reasonably probable that the subject property contributed to his lead poisoning. The plaintiff can "rule in" the subject property as a reasonably probable source through either direct or circumstantial evidence. *Kirson*, 439 Md. at 527–28 (citations omitted).

Under this second theory of causation, the plaintiff is not required to eliminate all other possible sources of lead exposure. *Id.* When a plaintiff may have been exposed to lead in multiple properties, his burden of proof does not change—he is still only required to show that the subject property was a reasonably probable source of his injury-causing exposure. *Id.* As the Court of Special Appeals explained in *Hamilton v. Dackman*, 213 Md. App. 589 (2013), when a trial court is evaluating a defendant's motion for summary judgment, the question is "not whether the [subject] property is *the* probable source, but whether it is *a* probable source of the lead paint that allegedly caused [the plaintiff's] injuries." *Id.* at 617 (emphasis in original). The court further explained that, as a matter of law, it is possible for a plaintiff to "create a genuine issue of fact that a property probably was responsible for something less than all of a plaintiff's demonstrated lead exposure." *Id.* at 616.

**Source: Rogers' Lead Exposure**

Rogers presented the following evidence to support his claim that he was exposed to lead-based paint at Towanda: (1) Towanda was built in 1920, when 95 percent of homes contained lead-based paint; (2) a 1976 Health Department report on Towanda documenting lead-based paint on 19 interior surfaces and requiring corrective action as to seven additional interior surfaces with flaking paint; (3) a note that acknowledged corrective action had been taken as to the flaking paint, but did not mention the 19 surfaces with lead-based paint; (4) building permits that show construction at Towanda between 1976 and 1996, but do not indicate a gut rehabilitation that would have fully abated the lead-based paint; (5) a 1989 Health Department referral for a child with elevated blood lead levels living at Towanda; (6) Rogers' January 8, 1997 and March 26, 1997 blood tests, which show an elevated blood lead level of 20–21 µg/dL while he resided at Towanda; (7) a 1997 Health Department file in which a caseworker noted that Towanda was in a "dilapidated" condition; (8) a 1997 Kennedy Krieger intake interview where Rogers-Coy indicated that the home did not appear to be renovated and that Rogers spent all of his time at Towanda while he resided there; (9) deposition testimony from Rogers-Coy that Towanda's windows and porch had layers of cracked paint; (10) a building permit that shows new windows were installed at Towanda in 2006; (11) a 2007 MDE Lead Paint Risk Reduction Inspection Certificate that did not certify the home as lead free; and (12) a 2014 Arc report documenting lead-based paint on the exterior of Towanda. Rogers argues that this

evidence, viewed in the light most favorable to him, establishes Towanda as a reasonably probable source of his lead exposure.

Home Equity asserts four arguments to support its position that summary judgment was properly granted as to source. First, Home Equity argues that because Rogers has not presented direct evidence of lead-based paint in the property at the time he resided there, Rogers is required to rule out other possible sources of lead exposure to make out a *prima facie* case of negligence. This argument misstates the law. As discussed *supra*, to survive summary judgment, Rogers must demonstrate that Towanda was a reasonably probable source of lead exposure. To satisfy this requirement, he can use direct evidence, circumstantial evidence, or both. *Kirson*, 439 Md. at 537–38, 544. His burden of proof remains the same regardless of the type of evidence he uses to meet it. Accordingly, Rogers' use of circumstantial evidence does not require him to eliminate all other possible sources to survive summary judgment.

Second, Home Equity argues that Dr. Simon impermissibly concluded that Towanda was a source of lead exposure due to the age of the home. Home Equity points to *Kirson* for its assertion that the age of a home cannot give rise to a reasonable inference of lead-based paint. In *Kirson*, we affirmed summary judgment in two consolidated cases. In one case, *Hamilton v. Kirson*, two expert witnesses testified that the subject property was a source of the plaintiffs' lead exposure based on the age of home, positive exterior lead testing, the mother's testimony that the children mouthed paint chips, and the children's elevated blood lead levels while they lived in the home. *Id.* at 518, 543. We held that this circumstantial evidence was not enough to establish the subject property as a

15

reasonably probable source of the plaintiffs' lead exposure without ruling out other possible sources. *Id.* at 544. We explained that a presumption that houses of a certain age contain lead-based paint is "insufficient for an expert to reach the conclusion that the interior of a specific property contained lead-based paint during the relevant time period." *Id.*

In this case, however, Dr. Simon reached his conclusion that Towanda was a source of Rogers' lead exposure based on a robust record, including the 1976 testing, the 1989 referral to the Health Department, and notes from the Health Department's 1997 home visit.[8] Although his report indicated that houses built before 1950 "would most likely contain lead-based paint [ ], unless proven negative by testing," Dr. Simon did not rely on this inference to reach his conclusion. Dr. Simon had direct evidence that Towanda contained lead-based paint in 1976—he did not have to infer the presence of lead from the age of the property. Dr. Simon formulated his opinion based largely on the 1976 testing and the 1997 Health Department records describing Towanda's poor condition. He testified that the 1976 testing showed that lead-based paint was on "basically everything inside the house," and that the Health Department's description of Towanda as "dilapidated" in 1997 suggested that it was "extremely unlikely" that the lead-based paint had been fully abated. Rogers has presented sufficient evidence for both Dr. Simon and a

---

[8] In his report, Dr. Robert K. Simon indicated that he also relied upon Housing Authority of Baltimore City ("HABC") records that documented continued abatement at Towanda between 2008 and 2013. He reasoned that if the property required abatement work during this time, the home must not have been fully abated in the 1990s, when Rogers lived there. These HABC documents are not in the record before us.

16

jury to reasonably infer that Towanda still contained lead-based paint in the mid-1990s, without improperly relying on the age of the home.

Third, Home Equity contends that the 2014 exterior testing cannot give rise to a reasonable inference that Towanda's interior contained lead-based paint in 1996 and 1997. This may be so. *See id.* at 543–44 ("[T]o even enter the realm of 'substantial contributing source,' **a house has to be shown to have had lead-based paint—almost invariably in the interior of the building.**" (emphasis in original)); *Dackman*, 213 Md. App. at 603. But Rogers is not relying on the exterior testing as the mainstay of his claim. Rather, he has produced extensive circumstantial evidence, including the 1976 interior test, which allows a reasonable inference that the interior of Towanda exposed Rogers to lead paint.

Lastly, Home Equity argues that Rogers has not presented enough evidence overall to establish Towanda as a reasonably probable source of lead exposure, and thus summary judgment was properly granted on those grounds. Specifically, Home Equity argues that due to the construction projects that took place at Towanda after 1976, including painting, is it not reasonable to infer that the same lead paint that covered the walls in the 1970s poisoned Rogers in the 1990s. It contends that Rogers' circumstantial evidence "is insufficient to 'rule in' the Towanda Property." We disagree. As discussed *supra*, Rogers' case is distinguishable from *Kirson*, in which we held that the plaintiffs had not presented sufficient evidence to establish the subject property as a reasonably probable source of their lead exposure. 439 Md. at 544. Additionally, the quality and quantity of circumstantial evidence in the record before us distinguishes Rogers' case from *Dackman*, 213 Md. App.

17

589, and *Taylor v. Fishkind*, 207 Md. App. 121 (2012), in which the Court of Special Appeals affirmed the trial courts' grants of summary judgment on the issue of source.

In *Dackman*, the plaintiff exhibited elevated blood lead levels during the time his father lived in the subject property, and he was observed mouthing paint chips when he visited and sometimes stayed overnight. 213 Md. App. at 592, 594. Testing detected lead-based paint above an exterior door. *Id.* at 618. The Court of Special Appeals held that this evidence was insufficient to establish the property as a reasonably probable source of the plaintiff's lead exposure. *Id.* at 618–19. The court adopted the analyses of the trial court that: (1) "[t]here is no basis for the logical inference that lead in the exterior paint of the house necessarily means it was present in the interior of the house"; and (2) "[t]he fact that lead was found at only one of eight tested locations on the exterior of the house only reinforces the risks of inferring the presence at one location from the presence of lead at a different location." *Id.* at 603. The Court of Special Appeals concluded that the plaintiff had only established a possibility—not a probability—that he was exposed to lead at the subject property. *Id.* at 618.

Unlike the plaintiff in *Dackman*, Rogers has presented enough evidence to advance Towanda across the line from a mere possible source of lead exposure to a reasonably probable source of lead exposure. The 1976 interior lead testing, paired with the lack of evidence showing full lead abatement, gives rise to a reasonable inference that Towanda's interior still contained lead-based paint when Rogers lived there. Additionally, the 2014 exterior testing revealed lead-based paint on four surfaces, including the porch where Rogers often played, as opposed to only one, out-of-reach surface in *Dackman*.

18

Finally, the plaintiff in *Dackman* divided his time between the subject property and his mother's house. In that case, it was possible that another property, where the plaintiff was spending time concurrently, was causing his elevated blood lead levels. Here, Rogers spent all of his time at Towanda during the six months he lived there. There are no possible concurrent sources of exposure. Home Equity argues that Rogers' elevated blood lead levels in January and March of 1997 were due to the lingering effects of his exposure at Chinquapin. But Dr. McDaniel testified that a child's blood lead level will decrease about 30 to 45 days after an exposure has ended. Based on her testimony, it is reasonable to infer that if Towanda was not a source of lead exposure, Rogers' blood lead level would have decreased between January and March 1997. Instead, it remained elevated until he moved out of Towanda. Thus, a jury could reasonably conclude that Towanda was exposing Rogers to lead.

Rogers' case is also distinguishable from *Taylor v. Fishkind*. In *Taylor*, the Court of Special Appeals affirmed the trial court's grant of summary judgment when the plaintiff was unable to rule out other possible sources of lead and presented "scant evidence" that she was exposed to lead-based paint in the subject property. 207 Md. App. at 142. The plaintiff put forth evidence that the property was built before 1913 and had not been fully rehabilitated since. *Id.* at 143. She demonstrated elevated blood lead levels and mouthed paint chips while she lived in the property. *Id.* at 125, 129. Testing detected lead-based paint on an exterior window apron. *Id.* at 129. The intermediate appellate court explained that this evidence did not support the plaintiff's assertion that the home contained lead-based paint. *Id.* at 144. For a jury to conclude that the house was a reasonably probable

19

source of the plaintiff's lead exposure, it would have to rely on the impermissible assumption that old homes contain lead paint. *Id.* Furthermore, the plaintiff's blood lead level declined from 17 µg/dL to 7 µg/dL while she lived in the subject property. *Id.* at 125.

In the case before us, the evidence Rogers has presented to support the conclusion that Towanda contained lead-based paint cannot be described as "scant." Rogers has presented evidence that the interior of Towanda—not only the exterior—contained lead-based paint. The 1976 interior testing is particularly persuasive when viewed in light of the law at the time, which only required landlords to abate lead paint within four feet of the floor. *See Ronald Fishkind Realty v. Sampson*, 306 Md. 269, 278 (1986). Furthermore, the building permits issued between 1976 and 1996 suggest that Towanda was never fully rehabilitated. Indeed, the Court of Special Appeals explained in *Taylor* that "[i]f the property contained lead-based paint when it was originally constructed, then lack of evidence of a gut rehabilitation prior to [the plaintiff] living there would support the conclusion that the property still contained lead-based paint when [she] lived there." 207 Md. App. at 144. Additionally, Rogers' blood lead levels remained elevated throughout his residence at Towanda. They did not begin to decline until he moved out of the property.

Construing all reasonable inferences in favor of Rogers, we hold that he has presented sufficient evidence to establish Towanda as a reasonably probable source of lead exposure. Thus, summary judgment was improperly granted on this issue.

**Source Causation: Cause of Rogers' Elevated Blood Lead Levels**

In addition to demonstrating that Towanda was a reasonably probable source of Rogers' lead exposure, Rogers must also demonstrate source causation—a reasonable

probability that his exposure at Towanda contributed to his elevated blood lead levels. Because Rogers has not attempted to rule out other possible sources of his lead exposure, he must present enough evidence to "rule in" Towanda as a contributing source. *See Rowhouses*, 446 Md. at 648–49 (quoting *Dackman*, 213 Md. App. at 616–17). In other words, he must demonstrate that it was a substantial contributing factor to his injury. *See Ross*, 430 Md. at 668.

The Court of Special Appeals first applied the substantial factor analysis in a lead paint case in *Bartholomee v. Casey*, 103 Md. App. 34 (1994). It explained, "Where the conduct of a defendant was a **substantial factor** in bringing about the suffering of an injury, such conduct will be deemed to have 'caused' the injury." *Id.* at 56 (emphasis added) (quoting W. Page Keeton et al., *Prosser and Keeton on Torts*, § 41, at 266–68 (5th ed. 1984 & Supp. 1988)). We adopted this reasoning in *Ross*, where we elaborated:

> To be a substantial factor in causing [the plaintiff's] injuries, the [subject property] must have been a source of [the plaintiff's] exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.

430 Md. at 668.

Home Equity argues that because Rogers has admitted that his previous residence, Chinquapin, was a reasonably probable source of his lead exposure, he has only established a possibility—not a probability—that Towanda also contributed to his elevated blood lead levels. It relies on *Peterson v. Underwood* for the proposition that to survive summary

21

judgment, Rogers must produce more evidence on source causation. In *Peterson*, the Court explained:

> [T]he plaintiff produces legally sufficient proof to get to the jury once he shows it is **more probable than not** that the defendant's act caused his injury. This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff [cannot] recover.

*Peterson*, 258 Md. at 17 (emphasis added) (citations omitted). Home Equity argues that Rogers has presented two equally likely causes of his injury: Chinquapin and Towanda. Thus, he cannot recover from Home Equity. But *Peterson*'s reasoning does not apply in the lead paint context.

In *Rowhouses*, we explicitly rejected the "more probable than not" standard for lead paint cases. We held that, "for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is **less than 'more likely than not.'**" *Rowhouses*, 446 Md. at 655 (emphasis added). We explained, "[T]here are degrees of probability, with more likely than not having the highest degree of probability, followed by reasonable probability, followed by mere possibility." *Id.* In a lead paint case, a plaintiff is not required to show that one source of his lead exposure contributed to his injury to a greater degree than another. *See Kirson*, 439 Md. at 544 (explaining that a plaintiff can survive summary judgment without evidence as to other possible sources of lead exposure). Once a plaintiff has established a property as a reasonably probable source of his lead exposure, a defendant cannot avoid liability by pointing to other properties that also exposed the plaintiff to lead. A plaintiff can

demonstrate more than one reasonably probable source of injury-causing lead exposure and still survive summary judgment.

Rogers presents the following evidence to show that Towanda was a reasonably probable source of his elevated blood lead levels: (1) his blood tests demonstrating an elevated lead level of 21 µg/dL in January 1997 and 20–21 µg/dL in March 1997; (2) his April 30, 1997 test, which read 17–18 µg/dL, and his August 22, 1997 test, which shows a further decline to 13 µg/dL; (3) Dr. McDaniel's testimony that it takes 30 to 45 days after the exposure has ended for the level of lead in a child's blood to decrease; (4) a 1997 Health Department caseworker's report that she observed Rogers mouthing a windowsill during a home visit; (5) the 2014 Arc exterior testing that found lead-based paint on the porch, where Rogers-Coy testified that she sat with Rogers;[9] (6) Dr. Simon's conclusion that "to a reasonable degree of scientific probability . . . Towanda . . . was a substantial contributing source of [ ] Rogers' lead exposure and lead poisoning during his early childhood"; and (7) Dr. McDaniel's report, which stated "with a high degree [of] medical probability" that Towanda "was a substantial contributing factor to his elevated lead levels." Rogers contends that this evidence is sufficient to establish Towanda as a reasonably probable cause of his elevated blood lead levels.

_____

[9] Home Equity claims that Rogers is not permitted to raise this argument on appeal because it was not asserted before the trial court. *See* Md. Rule 8-131(a). We disagree. Both pieces of evidence that support his assertion were presented below. The 2014 Arc Environmental, Inc. report and Rogers-Coy's testimony regarding the porch were attached to Rogers' response to Home Equity's motion for summary judgment. Additionally, before the trial court, Rogers argued that he was exposed to lead paint when chips and dust from the porch were tracked into the house.

23

Focusing on the timing of Rogers' blood tests, Home Equity argues that because of the gap in blood lead testing between March 25, 1996 and January 8, 1997, it is impossible to know whether Rogers' blood lead levels increased when he moved to Towanda. The gap in blood lead testing is illustrated with dashed lines in the chart below:

Rogers' Blood Lead Level Testing



Home Equity contends that because Rogers initially exhibited elevated blood lead levels at Chinquapin, his January 1997 and March 1997 blood lead tests just reflect the continuing effects of the Chinquapin exposure. To demonstrate a reasonable probability that Towanda contributed to his elevated lead levels, Home Equity argues that Rogers must "show a reasonable probability that the 21 µg/dL measurement represents an increase over his blood lead level before he moved to [Towanda.]" Again, we disagree.

To reach a jury, Rogers must only show that it is reasonably probable that Towanda contributed to his elevated lead levels—he does not have to demonstrate that his lead level

increased when he moved in. As the Court of Special Appeals explained in *Dackman*, "[T]he fact that a lead-exposed child might have lived or spent time in more than one lead-based-painted property should not foreclose that child as a matter of law from pursuing any one of those potential sources—as long as he is able to *rule in* the subject property . . . ." *Dackman*, 213 Md. App. at 616 (emphasis in original). Although Rogers cannot prove that his blood lead levels increased when he moved to Towanda, they remained elevated without decrease while he lived there. Dr. McDaniel testified that once Rogers was no longer exposed to lead, his blood lead levels would decrease after about 30 to 45 days. From this, a jury could reasonably infer that if Towanda was not a contributing source, his March 1997 lead level would have been lower.

To explain Rogers' declining lead levels after he moved out of Towanda, Home Equity argues that they were part of a larger declining trend that began once Rogers left Chinquapin. In essence, Home Equity contends that because Chinquapin was almost certainly a source of exposure, Rogers' blood lead level continued to rise after the March 1996 test. Then, when Rogers moved to Towanda, his blood lead level began to decrease because he was no longer being exposed to lead. But, in a summary judgment context, this argument is thwarted by Dr. McDaniel's testimony that blood lead will dissipate after about 30 days, the amount of time between the March 1997 and April 1997 blood tests. Viewing this evidence in the light most favorable to Rogers, a jury could reasonably infer that his blood lead level declined in April 1997 because he had left the source of his exposure, which was Towanda.

We hold that Rogers has presented sufficient evidence to demonstrate that Towanda was a reasonably probable cause of his elevated blood lead levels, and that summary judgment was improperly granted on this ground.

## CONCLUSION

Rogers has presented sufficient circumstantial evidence to establish Towanda as a reasonably probable source of his injury-causing lead exposure. Therefore, summary judgment was improperly granted on the issues of source and source causation. Accordingly, we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 57

September Term, 2016

_____

TERRENCE ROGERS

v.

HOME EQUITY USA, INC.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: May 30, 2017

Respectfully, I concur. I agree with the result reached by the Majority and I think that the majority opinion does a fine job comparing and contrasting this case with other cases involving lead-based paint as to source of lead exposure, *i.e.*, the source link.[1] I write separately, however, to point out that the Majority's analysis and holding as to the source of lead exposure ultimately rests on a <u>Hamilton v. Kirson</u>, 439 Md. 501, 96 A.3d 714 (2014),[2] theory of causation, and that the Majority's holding does not in any way affect or change this Court's jurisprudence with respect to a <u>Dow v. L & R Props., Inc.</u>, 144 Md. App. 67, 796 A.2d 139 (2002), theory of causation.

I agree with the Majority that there are two methods in which a plaintiff in a lead-based paint case can establish a subject property as a reasonable probable source of lead exposure. <u>See</u> Maj. Slip Op. at 12-13. These two methods are a <u>Dow</u> theory of causation and what I will term a <u>Kirson</u> theory of causation. As this Court recently explained in <u>Rowhouses, Inc. v. Smith</u>, 446 Md. 611, 659, 133 A.3d 1054, 1083 (2016), when a plaintiff in a lead-based paint case "proceed[s] under a *Dow* theory of causation—*i.e.*, using circumstantial evidence to establish the subject property as a reasonable probable source of lead exposure—[the] plaintiff must rule out other reasonably probable sources." (Citations and footnote omitted). We held that, under a <u>Dow</u> theory of causation, circumstantial evidence may be used to rule out another property as a reasonable probable

---

[1] I also fully agree with the Majority's analysis as to source causation. Medical causation was not at issue in this case.

[2] Although this Court's opinion in <u>Rowhouses, Inc. v. Smith</u>, 446 Md. 611, 649, 133 A.3d 1054, 1077 (2016), refers to the case as "<u>Hamilton</u>," consistent with the majority opinion, I shall refer to the case as "<u>Kirson</u>." <u>See</u> Maj. Slip Op. at 13, 15, 17.

source of lead exposure.  Id. at 660, 133 A.3d at 1083-84.

By contrast, in Rowhouses, id. at 659 n.13, 133 A.3d at 1083 n.13, we described the Kirson theory of causation as follows:

> In *[Kirson]*, 439 Md. at 537-38, 96 A.3d at 736, we recognized that, under certain circumstances, a plaintiff may establish a prima facie negligence case using circumstantial evidence even without excluding other reasonably probable sources of lead—*i.e.*, even without proceeding under a *Dow* theory of causation—and provided the example of the four row houses, in which the subject property was immediately between two houses that had also been built in the 1920s and that had both tested positive for the presence of lead-based paint.  We stated that, in that hypothetical, the plaintiff could "present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead[ ] poisoning." *[Kirson]*, 439 Md. at 538, 96 A.3d at 736 (footnote omitted).

(Brackets in original).  In other words, under a Kirson theory of causation, a plaintiff in a lead-based paint case who presents sufficient circumstantial evidence from which a jury could reasonably infer that the subject property contained lead-based paint and was a reasonable probable source of lead exposure is not required to rule out all other reasonable probable sources of lead exposure.

Indeed, in Kirson, 439 Md. at 537, 96 A.3d at 736, we discussed the methods of establishing a property as a reasonable probable source of lead exposure, and explained that "[a] lead-[based ]paint poisoned plaintiff may prove circumstantially that the subject property contained lead-based paint in a number of ways."  One such way to present a *prima facie* negligence case is "to exclude other reasonably probable sources of lead, [] as in *Dow*[.]"  Kirson, 439 Md. at 537, 96 A.3d at 736.  We  described an example of a second way to present a *prima facie* negligence case—the Kirson theory of causation— providing

an illustration of a row of four row houses, A, B, C, and D, in which row house B, the subject property, is between row house A and row house C. The interiors of row house A and row house C both had previously tested positive for the presence of lead-based paint. See id. at 537, 96 A.3d at 736. We explained the illustration, stating:

> In this hypothetical, row house "B" is the subject property . . . that a plaintiff hopes to prove, through circumstantial evidence, contains lead-based paint. Perhaps the row house was razed, however, and direct testing is impossible at the time of the litigation. There exists, however, evidence that these four row houses were built at the same time in the 1920[]s and that they were owned as a group by a series of persons or entities through the 1950[]s. Moreover, the City's records reveal that row houses "A" and "C" . . . tested positive previously for lead[-based] paint on the interior of the houses. Thus, in this hypothetical (at least in the absence of evidence of lead abatement measures), the plaintiff is able to present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead[] poisoning.

Id. at 538, 96 A.3d at 736 (footnote omitted). We summarized our reasoning as to the two ways to present a *prima facie* negligence case, stating: "Where a plaintiff who does not produce evidence to support another theory of causation and, instead, relies on a causation theory similar to that espoused in *Dow*, the validity of the necessary inference is limited to those circumstances where the plaintiff is able also to exclude other reasonably probable sources of lead exposure." Id. at 538, 96 A.3d at 736. We concluded, however, that "*Dow* does not define the only set of circumstantial facts that may satisfy a plaintiff's burden to establish a *prima facie* negligence case for lead [] poisoning." Id. at 542, 96 A.3d at 739. Indeed, "[t]he pertinent question to be asked is whether the particular circumstantial evidence permits an inference or inferences of the desired ultimate fact or facts as a 'reasonable likelihood or probability,' and not a mere 'possibility.'" Id. at 542, 96 A.3d at

739. Thus, we disagreed "with the exclusivity of [the] conclusion" "that the only way to prove a *prima facie* negligence case circumstantially is to eliminate every other reasonable possibility as an alternative source[.]" Id. at 542, 96 A.3d at 739.

To summarize, under a Dow theory of causation, a plaintiff in a lead-based paint case must rule out other reasonable probable sources of lead exposure, and must produce admissible circumstantial evidence that rules in the subject property as a reasonable probable source of lead exposure. See Rowhouses, 446 Md. at 666, 133 A.3d at 1087. Simply ruling out properties and having the subject property remain with no evidence indicating it as a reasonable probable source of lead exposure would not fulfill the requisite causation link under a Dow theory of causation. Under a Kirson theory of causation, however, a plaintiff in a lead-based paint case must present circumstantial evidence to such a degree that from that circumstantial evidence alone a jury could reasonably infer that the subject property contained lead-based paint and was a reasonable probable source of lead exposure, without the necessity of the plaintiff ruling out all other reasonable probable sources of lead exposure. For example, in the Kirson hypothetical, we indicated that evidence that the four properties were built at the same time and that adjacent properties previously tested positive for the presence of lead-based paint in their interiors, coupled with other circumstantial evidence, would have been sufficient to establish that the subject property contained lead-based paint and was a reasonable probable source of lead exposure.

Given this framework, I think it is worthwhile to point out that, although the majority opinion does not explicitly make the point, it is evident that the majority opinion applies a Kirson theory of causation in this case. Indeed, the majority opinion does not

expressly state under which theory of causation it is proceeding. Without identifying any particular theory of causation as the basis for the holding, the majority opinion states: "Construing all reasonable inferences in favor of Rogers, we hold that he has presented sufficient evidence to establish Towanda as a reasonably probable source of lead exposure. Thus, summary judgment was improperly granted on this issue." Maj. Slip Op. at 20. In actuality, the Majority utilizes the rationale of a <u>Kirson</u> theory of causation for establishing the subject property in this case as a reasonable probable source of lead exposure. <u>See</u> Maj. Slip Op. at 14-20. To be sure, the Majority is correct that this case is factually distinguishable from <u>Kirson</u>, "in which we held that the plaintiffs had not presented sufficient evidence to establish the subject property as a reasonably probable source of their lead exposure." Maj. Slip Op. at 17. In <u>Kirson</u>, 439 Md. at 542-44, 545-46, 96 A.3d at 739-40, 740-41, although the Court described a theory of causation in which it was not necessary to rule out other reasonable probable sources of lead exposure, the Court actually applied a <u>Dow</u> theory of causation in the two cases before it. Even though the circumstances of the cases may be different, the theory of causation derived from <u>Kirson</u> is applicable here and, when applied by the Majority, results in a different outcome from the two cases involved in <u>Kirson</u>, *i.e.,* the facts in this case are sufficient to establish that the subject property contained lead-based paint and was a reasonable probable source of lead exposure under a <u>Kirson</u> theory of causation.

Indeed, the circumstances of this case are strikingly similar to the hypothetical that we posed in <u>Kirson</u>, 439 Md. at 538, 96 A.3d at 736, in which there are four row houses, in which the subject property, row house "B," which had been built in the 1920s, was

- 5 -

immediately between two houses that had been built at the same time in the 1920s and that had both tested positive for the presence of lead-based paint in the interior of the houses and where it was unknown if the fourth row house contained lead-based paint. Central to the Kirson analysis was the circumstance that the property at issue was located between two houses that had been built at the same time and both of the adjacent properties had tested positive for the presence of lead-based paint. In this case, the subject property itself previously had tested positive in 1976 for the presence of lead-based paint in the interior of the house, twenty years before Rogers resided in the subject property, and there had not been a full abatement. These circumstances, coupled with the other evidence identified by the Majority, see Maj. Slip Op. at 14, is sufficient circumstantial evidence under a Kirson theory of causation to establish that the subject property contained lead-based paint and was a reasonable probable source of lead exposure, and there was no need for Rogers to rule out other reasonable probable sources of lead exposure. This is essentially the conclusion reached by the Majority and, to my knowledge, this is the first time that a strict Kirson theory of causation has been applied.

Because it is evident that the majority opinion applies a Kirson theory of causation in reaching the determination that the subject property is a reasonable probable source of lead exposure, in my view, it is valuable to explicitly recognize that nothing in the majority opinion purports to alter the Dow theory of causation and the requirement that, when a plaintiff in a lead-based paint case is proceeding under a Dow theory of causation, the plaintiff must rule out other reasonable probable sources of lead exposure. Stated otherwise, the majority opinion does not eliminate from the Dow theory of causation the

necessity of ruling out other reasonable probable sources of lead exposure. And importantly, the majority opinion does not eliminate the <u>Dow</u> theory of causation as a required method for a plaintiff in a lead-based paint case to establish a subject property as a reasonable probable source of lead exposure where a plaintiff does not have the level and quality of circumstantial evidence that would satisfy a <u>Kirson</u> theory of causation.

In sum, because there has been a great deal of development in recent years concerning lead-based paint cases and cases must be assessed on a case-by-case basis, to avoid any possible confusion by attorneys or potential misapplications of the majority opinion, I think it sensible to expressly state that the majority opinion applies a <u>Kirson</u> theory of causation in this case because Rogers presented sufficient circumstantial evidence to such a degree that a jury could reasonably infer that the subject property contained lead-based paint and was a reasonable probable source of his lead exposure. As such, Rogers was not required to rule out other reasonable probable sources of lead exposure under the circumstances, and nothing in the majority opinion alters the requirement that, when proceeding under a <u>Dow</u> theory of causation, a plaintiff in a lead-based paint case is still required to rule out other reasonable probable sources of lead exposure.

For the above reasons, respectfully, I concur.

Circuit Court for Baltimore City
Case No. 24-C-13-003480
Argued: February 6, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 57

September Term, 2016

_____

TERRENCE ROGERS

v.

HOME EQUITY USA, INC.

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Getty, J.

_____

Filed: May 30, 2017

I respectfully dissent from the Majority's conclusion that Terrence Rogers met his burden in this case to demonstrate that his brief period of residency at the rental property owned by Home Equity USA, Inc. ("Home Equity") at 3738 Towanda Avenue, Baltimore, Maryland ("the Towanda Property") caused him harm. Based on the record before us, I would affirm the trial court's grant of summary judgment in favor of Home Equity on the same grounds as the Court of Special Appeals, namely, that Mr. Rogers failed to show that the Towanda Property was a substantial factor in causing his elevated blood lead levels.

I write out of concern that today's Majority and Concurring opinions substantially lower the bar that a plaintiff must surpass in order to avoid summary judgment in a lead paint negligence action. Under well-established principles of Maryland tort law, the proper burden of proof as to causation, even at the summary judgment stage, is whether the plaintiff has shown that the defendant's property was a probable, meaning more likely than not, source of his lead poisoning. Therefore, when there are two or more reasonably likely causes of the plaintiff's lead poisoning, as occurred in this case, the plaintiff must show that the defendant's property is a more probable source of the harm than the other(s) in order to survive summary judgment. *See Peterson v. Underwood*, 258 Md. 9, 17 (1970).

By contrast, the Majority and Concurrence both rely instead upon our holding in *Hamilton v. Kirson*, 439 Md. 501 (2014), which they regard as establishing a new, alternative theory of causation, distinct from that set forth in a line of cases starting with *Dow v. L & R Props., Inc.*, 144 Md. App. 67 (2002). *See* Majority Slip Op. at 13; Concurring Slip Op. at 6. Under a *Dow* theory of causation, a plaintiff may defeat a defense motion for summary judgment in a lead paint case if he can "rule out" other sources of lead

exposure, and thereby show that the subject property is the "only possible" source of his lead exposure. 144 Md. App. at 75-76. But, under what the Concurrence describes as a new "*Kirson* theory of causation," the Majority today holds that even without excluding other reasonably probable sources of lead, a plaintiff may establish a *prima facie* negligence case if he can "rule in" the subject property as a source of lead exposure by showing, through direct or circumstantial evidence, that it is "reasonably probable" that the plaintiff was exposed to lead-based paint at the subject property, and that there is a "reasonable probability" that the exposure at that property contributed to his elevated blood lead levels. *See* Majority Slip Op. at 13, 21-22; Concurring Slip Op. at 1-2.

However, that alternative theory of causation was not our holding in *Kirson*, in which we held that plaintiffs had not met their burden under a *Dow* theory of causation. 439 Md. at 544-46. Rather, the alternative theory upon which the Majority relies is based upon a hypothetical described in *Kirson* that had no connection to the facts of that case and, therefore, was *dicta*. *Id.* at 537-38. Indeed, as noted in the Concurrence, this is, apparently, the first time such a theory has been applied. *See* Concurring Slip Op. at 6.

I respectfully disagree with the Majority and Concurrence's endorsement today of a new, alternative theory of causation in lead paint cases. Initially, I believe that the hypothetical described in *Kirson* does not support the Majority's holding. The hypothetical describes a scenario in which a unit of four, side-by-side row houses "were built at the same time in the 1920[]s," those houses were "owned as a group by a series of persons or entities through the 1950[]s," and the home that is the subject property in the litigation was situated between two others in the group that had tested positive for lead-based paint.

2

*Kirson*, 439 Md. at 538. According to the *Kirson* Court, "in the absence of evidence of lead abatement measures," that hypothetical shows sufficient "circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint." *Id.* That statement may be true, but even if it is, it is limited to the specific set of facts set forth in the hypothetical—a unit of homes built together in the 1920s, sustained common ownership of those homes for decades, and the absence of any evidence of lead abatement measures. Those facts are entirely divergent from the relevant facts of this case, which involve potential lead exposure in two widely separated homes, not in common ownership, and where there was evidence that lead abatement measures had occurred in the source property.

Moreover, as the *Kirson* Court itself recognized, the hypothetical does not describe what kind of circumstantial evidence would be sufficient for a separate prong of the substantial factor analysis for source causation in a lead paint case, namely, whether a plaintiff's period of residency at a given property that may have contained lead-based paint caused his elevated blood lead levels. That prong of the analysis is particularly significant when, as here, the plaintiff has also resided in at least one other home containing lead-based paint. The hypothetical thus has nothing to offer as to what I view as the critical issue in this case—whether Mr. Rogers has shown sufficient evidence that it was his stay at the Towanda Property that caused his elevated lead blood levels, as opposed to his immediately prior stay at another property that the plaintiff's expert conceded contained lead-based paint, 6419 Chinquapin Parkway (the "Chinquapin Property").

3

As to that issue, I disagree with the Majority's holding that, at the summary judgment stage, Mr. Rogers could "rule in" the Towanda Property as a substantial factor cause of his elevated blood lead levels merely by advancing circumstantial evidence that the Towanda Property was a "reasonably probable source" of those elevated blood lead levels, and without showing that it was a more probable source than the Chinquapin Property. *See* Majority Slip Op. at 21-23. The Majority, relying upon our recent holding in *Rowhouses, Inc. v. Smith*, 446 Md. 611, 655 (2016), defines a "reasonably probable source" as floating somewhere between a "possibility" that the defendant's property was the source of the plaintiff's lead exposure and elevated blood lead levels and a showing that the property was the "more probable than not" source of that harm. Majority Slip Op. at 22. I believe that the Majority's holding reflects a troubling trend in this Court's recent lead paint cases, in which the Court has moved away from the longstanding standard in Maryland tort law that a plaintiff must put forth sufficient evidence to enable a jury to find that it was more probable than not that the defendant caused his harm. As this Court explained in *Peterson v. Underwood*, the more probable than not standard is necessary at the summary judgment stage in order to prevent the jury from assigning fault based on "mere conjecture or speculation" that the defendant caused the harm at issue. 258 Md. at 19. This Court has not provided a clear basis in law or public policy for its recent shift away from the more probable than not standard for causation in lead paint cases at the summary judgment stage, and the nebulously defined "reasonably probable source" standard that has taken its place is likely to prove difficult for trial courts to apply.

4

Moreover, *Rowhouses*, on which the Majority relies, was premised on a *Dow* theory of causation, in which a plaintiff still has to rule out other sources of the plaintiff's lead exposure in order to show that a defendant's property was the source of his lead poisoning. The Majority's holding that it is enough for a plaintiff to "rule in" a property as a "reasonably probable source" of the plaintiff's lead exposure and elevated blood lead levels even when, as is true in this case, there are other reasonably probable sources of that harm, thus operates to substantially lower the bar for causation in a lead paint action below even the lessened standard set in *Rowhouses*.

Rather than endorse a new causal theory that significantly furthers the recent trend towards a lower burden of proof for causation in lead paint cases, I would instead rely on the well-established principle of tort law that, when a plaintiff's own evidence shows that there are two or more potential causes of an injury, each of which is more than a mere possibility, the plaintiff must show that the source for which the defendant is responsible is a more probable source of the harm than the other(s) in order to survive summary judgment. *See Peterson*, 258 Md. at 17.[1] Applying that standard to the facts of this case,

---

[1] This standard may not apply when the plaintiff merely claims that the defendant's property is *a* contributing source of his harm from lead exposure, as part of a claim that multiple sources of lead exposure cumulatively proximately caused his harm. *See, e.g.*, *Hamilton v. Dackman*, 213 Md. App. 589, 616 (2013) (noting that a plaintiff may be able to "create a genuine issue of fact that a property probably was responsible for something less than all of [his] demonstrated lead exposure," as part of a negligence claim that multiple contributing sources of lead concurred to proximately cause his elevated blood lead levels, although also noting that such a claim would be a "hard case" to establish, because "a plaintiff would need to produce probability-level evidence as to exposure at each property separately"). Here, Mr. Rogers' complaint brought claims against the owners of both the Towanda Property and the Chinquapin Property, but he then voluntarily dismissed his claims against the owners of the Chinquapin Property prior to the trial court's

5

I agree with the Majority and Concurrence that the evidence put forth by Mr. Rogers was sufficient for a reasonable jury to infer that it was more probable than not that there was lead-based paint in the interior of the Towanda Property during the time that Mr. Rogers resided at that property. However, I would follow the Court of Special Appeals in holding that the evidence put forth by Mr. Rogers was insufficient to show that his time residing at the Towanda Property was a more probable source of his harm from lead exposure than his time residing at another property that also contained lead-based paint and, therefore, summary judgment was appropriately granted in favor of Home Equity.

## A. Causation in Lead Paint Litigation

"'It is fundamental that in a negligence action the plaintiff has the burden of proving all the facts essential to constitute the cause of action,'" including that "the defendant's negligence was a proximate cause of the accident or injury."[2] *Kirson*, 439 Md. at 526 (quoting *Peterson*, 258 Md. at 15). One aspect of proximate cause, and the only aspect at

summary judgment ruling. Therefore, he was required to show that the Towanda Property was a more probable source of harm than the Chinquapin Property.

[2] As the Majority notes, "[Mr.] Rogers seems to have based his negligence claim" upon a violation of the Baltimore City Housing Code. Majority Slip Op. at 10. Relying on *Brooks v. Lewin Realty III, Inc.*, the Majority states that "[u]nder Maryland's common-law Statute or Ordinance Rule, [Mr.] Rogers can make out a *prima facie* case of negligence based upon a violation of the Housing Code by demonstrating (1) the violation of a section of the Housing Code 'designed to protect a specific class of persons which includes the plaintiff,' and (2) 'that the violation proximately caused the injury complained of.'" Majority Slip Op. at 10-11 (quoting *Brooks*, 378 Md. 70, 79 (2003)). However, as the Court of Special Appeals has recognized, *Brooks'* holding "does not relieve a plaintiff of the obligation to establish causation." *Hamilton v. Dackman*, 213 Md. App. at 613 (footnote omitted).

issue in this case, is causation-in fact or, in other words, "whether [a] defendant's conduct actually produced an injury." *Id.* (quoting *Peterson*, 258 Md. at 17). There are "two tests [that] have developed to determine if causation-in-fact exists, the but for test and the substantial factor test." *Pittway Corp. v. Collins*, 409 Md. 218, 244 (2009) (citing *Peterson*, 258 Md. at 16). The "but for" test is applicable if there is only one possible cause, and the question is whether "the injury would not have occurred 'but for' the defendant's negligent act." *Id.* (citing *Peterson*, 258 Md. at 16). The "substantial factor" test is applicable if "two or more independent negligent acts bring about an injury." *Id.* Black's Law Dictionary defines the "substantial-factor test" as "the principle that causation exists when the defendant's conduct is an important or significant contributor to the plaintiff's injuries." (10th ed. 2014).

As described by the Majority, the Court of Special Appeals first applied the substantial factor test in a lead paint case in *Bartholomee v. Casey*, 103 Md. App. 34 (1994), and we adopted the substantial factor test in a lead paint case in *Ross v. Housing Authority of Baltimore City*, 430 Md. 648 (2013). Majority Slip Op. at 21. In *Ross*, we explained that substantial factor causation in a lead paint case "can be conceived as a series of links":

> (1) the link between the defendant's property and the plaintiff's exposure to lead; (2) the link between specific exposure to lead and the elevated blood lead levels, and (3) the link between those blood lead levels and the injuries allegedly suffered by the plaintiff. To be a substantial factor in causing [a plaintiff's] alleged injuries, the [subject property] must have been a source of [the plaintiff's] exposure to lead, that exposure must have contributed to the elevated blood lead levels, and the associated increase in blood lead levels must have been substantial enough to contribute to her injuries.

7

*Ross*, 430 Md. at 668. The Majority refers to the three links described in *Ross* as "(1) source, (2) source causation, and (3) medical causation." Majority Slip Op. at 11. Later, in *Kirson*, we clarified that in order to establish the first "source" link in the chain, "the plaintiff must tender facts admissible in evidence that, if believed, establish two separate inferences: (1) that the property contained lead-based paint, and (2) that the lead-based paint at the subject property was a substantial contributor to the victim's exposure to lead." 439 Md. at 529-30.

### B. The Kirson *Hypothetical Does Not Support the Majority's Holding*

The Majority relies in part upon our statement in *Kirson*, that "[a] lead-[based] paint poisoned plaintiff may prove circumstantially that the subject property contained lead-based paint in a number of ways." *Id.* at 537. As described above, that statement was unrelated to the Court's holding in *Kirson*, and is thus *dicta*. The only support the Court offered for its *dicta* statement in *Kirson* was a hypothetical based upon an illustration. The illustration was "of four row houses, A, B, C, and D, in which row house B, the subject property, is between row house A and row house C," and "[t]he interiors of row house A and row house C both had previously tested positive for the presence of lead-based paint." Concurring Slip Op. at 3 (describing the illustration in *Kirson*, 439 Md. at 537). The *Kirson* Court then offered the following hypothetical based upon that illustration:

> In this hypothetical, row house "B" is the subject property [] that a plaintiff hopes to prove, through circumstantial evidence, contains lead-based paint. Perhaps the row house was razed, however, and direct testing is impossible at the time of the litigation. There exists, however, evidence that these four row houses were built at the same time in the 1920[]s and that they were owned as a group by a series of persons or entities through the 1950[]s.

8

> Moreover, the City's records reveal that row houses "A" and "C" [] tested positive previously for lead paint on the interior of the houses.

*Kirson*, 439 Md. at 538.

The *Kirson* Court stated that "in this hypothetical (at least in the absence of evidence of lead abatement measures), the plaintiff is able to present circumstantial evidence from which a jury could infer reasonably that the subject property contained lead-based paint—without having to exclude all other sources of potential exposure to lead-paint poisoning [as required in a *Dow* theory of causation]." *Id.* As previously discussed however, even accepting that statement as correct, it is limited to the narrow set of facts described in the hypothetical. The hypothetical describes a unit of side-by-side row houses built in the 1920s, when lead-based paint was commonly used to paint the interior of homes. And, especially critical to the hypothetical, the houses were held in common ownership as a group for decades, supporting logical inferences that they were painted in the same manner and that maintenance practices in one or two of the homes were replicated in all of them. Two of the houses in common ownership, which bordered the subject property on both sides, had tested positive for lead-based paint *prior* to the period of residency of the plaintiff in the subject property. Finally, there was an absence of any evidence of lead abatement measures.

None of those facts are mirrored in this case. Here, during the period of time at issue, Mr. Rogers lived in two geographically distant properties. These properties were not in common ownership, so there is no assumption that a landlord or management company used similar practices for painting or maintaining the properties. Although there

9

was additional circumstantial evidence that lead-based paint was present in the interior of the Towanda Property, in the form of a 1976 test positive for interior lead-based paint and other reports and witness testimony, that evidence was entirely dissimilar to that advanced in the hypothetical in *Kirson*. And, while there is no evidence in the record of a full, gut rehabilitation of the Towanda Property, there was evidence of some lead abatement measures in the interior of the Towanda Property prior to Mr. Rogers' period of residency at that property, including abatement records from 1976, and building permits for additional renovations between 1976 and 1996.

Thus, contrary to the reasoning advanced in the Concurrence, *Kirson* and the hypothetical stated therein do not support the Majority's holding that there was still lead-based paint in the Towanda Property at the time Mr. Rogers resided there. *See* Concurring Slip Op. at 5-6.[3] Nonetheless, I agree with the Majority that the evidence that the interior of the Towanda Property tested positive for lead-based paint, and that there was no evidence of a full gut rehabilitation or other full abatement of the interior, is sufficient for

---

[3] More broadly, given the *Kirson* hypothetical's reliance on a very particular set of facts, it should not be read to stand for the proposition that, whenever an individual home was built in the 1920s, or another period of time in which lead-based paint was commonly used, and there is some additional circumstantial evidence of the presence of lead-based paint in the interior of the home, that is sufficient to for a plaintiff to survive summary judgment as to whether the subject property contained lead-based paint. As the *Kirson* Court recognized, "Maryland courts 'have for some time required more of a plaintiff than simply a showing that he lived in an old house in an area where lead-based paint historically was present.'" *Id.* at 541 (quoting *Hamilton v. Dackman*, 213 Md. App. 589, 612 (2013). Thus, in addition to the age of the home, the plaintiff must present additional evidence to show that the interior of the home contained lead-based paint. That could be in the form of direct evidence of a positive lead-paint test while the plaintiff resided on the property, or robust circumstantial evidence, such as that described in the *Kirson* hypothetical.

a jury to infer that it was more probable than not that there was lead-based paint in the interior of the property. *See Taylor v. Fishkind*, 207 Md. App. 121, 144 (2012) (explaining that "[i]f the [subject] property contained lead-based paint when it was originally constructed, then lack of evidence of a gut rehabilitation prior to [the plaintiff] living there would support the conclusion that the property still contained lead-based paint when [the plaintiff] lived there"); Majority Slip Op. at 20.

Where I part company with the Majority is their conclusion that the evidence put forth by Mr. Rogers was sufficient to show a probability that any exposure to lead-based paint at the Towanda Property was a substantial factor cause of his elevated blood lead levels, and thus sufficient to meet the second "source causation" link in the *Ross* chain.[4] *See* Majority Slip Op. at 26. The *Kirson* hypothetical was offered only to illustrate that a plaintiff "may prove circumstantially *that the subject property contained lead-based paint*." 439 Md. at 537 (emphasis added). The hypothetical thus offers no support to the Majority's conclusion that Mr. Rogers put forth sufficient evidence for a reasonable jury

_____

[4] As noted previously, we held in *Kirson* that in order to establish the first "source" link in the chain of causation in a lead paint case, the plaintiff must not only show sufficient evidence that the property contained lead-based paint, but also "that the lead-based paint at the subject property was a substantial contributor to the victim's exposure to lead." 439 Md. at 530. However, the evidence on which Mr. Rogers primarily relies to establish that lead-based paint at the Towanda Property was a substantial contributor of his exposure to lead are tests showing elevated blood lead levels while he resided at the Towanda Property, and expert opinion interpreting those results. Thus, in this case, the issue of whether lead-based paint on the Towanda Property was a substantial factor cause of Mr. Rogers' exposure to lead turns entirely on whether he has presented sufficient evidence that his elevated blood lead levels in those tests reflect exposure to lead at the Towanda Property, rather than the Chinquapin Property—the second link in the *Ross* chain.

11

to infer that the Towanda Property was a substantial factor cause of his elevated blood lead levels.

### C. The Majority Opinion Lowers the Bar for Plaintiffs' Burden of Proof as to Causation at the Summary Judgment Stage in Lead Paint Litigation Without Providing a Policy or Legal Foundation For That Shift

In addition to relying upon *Kirson*, the Majority also rests its holding that Mr. Rogers has put forth sufficient evidence for a reasonable jury to infer that the Towanda Property was a substantial factor cause of his elevated blood lead levels on the standard of proof for a causation showing at the summary judgment stage in a lead paint case. The Majority, citing to our recent opinion in *Rowhouses, Inc. v. Smith*, 446 Md. 611, 655 (2016), holds that the standard of proof for causation in lead paint cases at the summary judgment stage is a "reasonable probability," which is less than "more likely than not" but more than a "mere possibility." Majority Slip Op. at 22. Because of what it construes as the relatively lower standard of proof for causation in a lead paint case, at least at the summary judgment stage, the Majority holds that even when there are two probable sources of lead-based paint that may have caused a plaintiff's harm from elevated blood lead levels, "a plaintiff is not required to show that one source of his lead exposure contributed to his injury to a greater degree than another." Majority Slip Op. at 22. As I shall explain, I believe that our prior holding in *Rowhouses, Inc.*, combined with the Majority's holding today, has substantially weakened the showing that a plaintiff must make as to causation in order to avoid summary judgment in a lead paint case, without articulating a clear reason grounded in the law or public policy for that shift.

12

In *Peterson v. Underwood*, which predates our lead paint jurisprudence, we set a standard, well-grounded in tort law theory, for a plaintiff's showing as to causation at the summary judgment stage, even when there are multiple potential substantial factor causes of an injury:

> [T]he plaintiff produces legally sufficient proof to get to the jury once he shows it is *more probable than not* that defendant's act caused his injury. This does not mean plaintiff is required to exclude every other possible cause of the accident. But where plaintiff by his own evidence shows two or more equally likely causes of the injury, for only one of which defendant is responsible, plaintiff can not recover.

*Peterson*, 258 Md. at 17 (emphasis added) (citations omitted). Similarly, in *Bartholomee v. Casey*, the first case in which the Court of Special Appeals applied a substantial factor analysis in a lead paint case, the intermediate appellate court held that there was insufficient evidence from which a jury "rationally could conclude that [the plaintiff's] exposure to lead from the paint at the [the subject property] was a substantial factor in causing the lead poisoning," when there was no testimony that "[plaintiff's] exposure to lead from the paint at the [subject property] was in any way more significant than her exposure to lead dust from the demolition and construction next door at [another property]." 103 Md. App. 34, 58 (1994).

Subsequently, in *Dow v. L & R Properties, Inc.*, the Court of Special Appeals considered a case where the plaintiff had put forth circumstantial evidence in support of a lead paint claim. 144 Md. App. 67, 73-74 (2002). The intermediate appellate court, drawing upon language from *Peterson*, reiterated that such circumstantial evidence "may support a negligence determination if it 'amount[s] to a reasonable likelihood or probability

13

rather than a possibility.'" *Id.* at 75 (quoting *Peterson*, 258 Md. at 17). The court held that evidence that "the [source property] was built prior to 1950, that such dwellings often contain lead-based paint, that [the plaintiff] ate paint chips in the dwelling, that [the plaintiff] was diagnosed with lead poisoning," and that, prior to that diagnosis, "[the plaintiff] did not spend time anywhere else and was never exposed to any other sources of lead," was sufficient to establish that the property "was the only possible source of [the plaintiff's] lead poisoning." *Id.* at 75-76. Coupled "with the undisputed fact that homes built before 1950 often contain lead-based paint," the court determined that the evidence "could indeed support an inference that the paint [in the interior of the home] in question contained lead" and, therefore, summary judgment should have been denied. *Id.* at 76.

A *Dow* theory of causation, which involves the use of circumstantial evidence to "rule out" other probable sources of lead-based paint exposure "in order to prove that it is probable that the subject property contained lead-based paint," *Kirson*, 439 Md. at 536, is entirely consistent with our precedent in *Peterson* and other cases that a plaintiff must show that a defendant's property was more probably than not the cause of his injury in order to survive summary judgment. Although the *Dow* court stated that the standard that a plaintiff must meet as to causation at the summary judgment stage is a "reasonable likelihood or probability," and did not employ the phrase "more probable than not," both wordings of the standard derive from the very same case, *Peterson*, and thus presumably should be read together as a unitary standard. In *Ross*, the first case in which we adopted the *Dow* theory of causation, and *Kirson*, 439 Md. at 530-31, we likewise quoted the "reasonable likelihood

14

or probability" language derived from *Peterson* without analyzing that language in detail. *See Ross*, 430 Md. at 669.

However, in this Court's most recent lead paint case, *Rowhouses, Inc.*, this Court "determine[d] that for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than 'more likely than not,' but more than a mere 'possibility.'" 446 Md. at 655. We explained that "there are degrees of probability, with more likely than not having the highest degree of probability, followed by reasonable probability, followed by mere possibility." *Id.* The Court proceeded to define a "reasonable probability" as "a fair likelihood that something is true," and stated that "[i]n the context of lead-based paint cases, that means that the subject property is a reasonable probable source of a plaintiff's lead exposure where there is a fair likelihood that the subject property contained lead-based paint and was a source of the lead exposure." *Id.* at 657. The Court also distinguished a "possibility" from a "reasonable probability" or "fair likelihood," explaining that "a possibility is a mere chance that something might be true, as opposed to a fair likelihood that something is true." *Id.* at 658. The Court noted that "[i]n the context of lead-based paint cases, any property in which a plaintiff has resided or visited could be a possible source of the plaintiff's lead exposure," but that such a property "does not become a reasonable probable source without additional evidence that elevates the mere chance that the property contained lead-based paint and was a source of lead exposure to the fair likelihood that the property contained lead-based paint and was a source of lead exposure." *Id.* at 659.

15

The Court then went on to state that "circumstantial evidence may be used both to establish the subject property as a reasonable probable source and to rule out other reasonably probable sources." *Id.* at 659. However, the actual holding in *Rowhouses* was limited to the facts of the case, in which the plaintiff had sought to use circumstantial evidence to "rule out" other probable sources of lead exposure under a *Dow* theory of causation. As previously discussed, the Majority opinion today appears to be the first time this Court has held that a plaintiff may "rule in" a property as a source of lead exposure and a substantial factor cause of the plaintiff's lead poisoning solely through the use of circumstantial evidence.

I believe that this Court's departure from *Peterson*'s "more probable than not" standard of proof for causation in lead paint cases at the summary judgment stage, both by the *Rowhouses, Inc.* Court, as well as by the Majority today, is unwarranted. First, it may give rise to an artificial distinction between lead paint cases and the rest of our tort law jurisprudence, without a clearly articulated basis in law or public policy to support such a distinction. Second, in defining the "reasonable probability" standard as anything between a "possibility" and "more likely than not," the Court leaves open the possibility that circumstantial evidence as to causation in a lead paint case that has just one sliver of weight more than outright speculation or inferences not supported by logic might be deemed sufficient to advance beyond summary judgment. Third, it is likely that trial courts will have great difficulty in fairly applying the standard given the absence of any guidance as to what kind of additional evidence is needed to transform a mere possibility that a property

was a source of a plaintiff's lead exposure and elevated blood lead levels into a "reasonable probability" that the property was the source of the harm.

Moreover, I am even more concerned by the Majority's extension of the "reasonably probable" standard to permit a plaintiff to move past summary judgment merely by "ruling in" a property as a reasonably probable source of the plaintiff's lead poisoning, even when there is one or more other reasonably probable sources of that harm. That holding is likely to unfairly burden property owners in factual situations similar to this case: where a plaintiff, who clearly has elevated blood lead levels, has lived in several homes, and the evidence is less than clear, either as to which of those homes had interior lead-based paint while the defendant lived there, or as to which source of lead-based paint was the likely cause of plaintiff's elevated blood lead levels. *See Peterson*, 258 Md. at 19 (noting that permitting a case to advance to a jury on "limited proof" would allow the jury "to indulge in mere conjecture or speculation" and thus "amount to holding that liability may be predicated upon the mere happening of an accident which, exclusive of *res ipsa loquitur* situations, is not the law of Maryland"); *Dackman*, 213 Md. App. at 612-13 (recognizing "the real-life evidentiary challenges that proving lead paint injuries poses" but noting that courts "have declined the invitation to assume causation away" in lead paint cases).

### D. Mr. Rogers Has Not Presented Evidence From Which a Jury Could Logically Infer That His Elevated Lead Blood Levels Were More Probably Than Not Caused By His Period of Residence at the Towanda Property, as Opposed to the Chinquapin Property

Applying what I believe to be the correct legal standard, I would hold that the evidence identified by the Majority as to "source causation," the link between Mr. Rogers'

17

period of residence at the Towanda Property and his elevated blood lead levels, is not sufficient to show that the Towanda Property was a more probable source of those elevated levels than the Chinquapin Property. The Majority identified the following evidence as to source causation:

> (1) his blood tests demonstrating an elevated lead level of 21 μg/dL in January 1997 and 20–21 μg/dL in March 1997; (2) his April 30, 1997 test, which read 17–18 μg/dL, and his August 22, 1997 test, which shows a further decline to 13 μg/dL; (3) Dr. McDaniel's testimony that it takes 30 to 45 days after the exposure has ended for the level of lead in a child's blood to decrease; (4) a 1997 Health Department caseworker's report that she observed Rogers mouthing a windowsill during a home visit; (5) the 2014 Arc exterior testing that found lead-based paint on the porch, where Rogers-Coy testified that she sat with Rogers; (6) Dr. Simon's conclusion that "to a reasonable degree of scientific probability . . . Towanda . . . was a substantial contributing source of [ ] Rogers' lead exposure and lead poisoning during his early childhood"; and (7) Dr. McDaniel's report, which stated "with a high degree [of] medical probability" that Towanda "was a substantial contributing factor to his elevated lead levels."

Majority Slip Op. at 23 (alterations and ellipses in original).

Home Equity has argued that "because of the gap in blood lead testing between March 25, 1996 and January 8, 1997, it is impossible to know whether [Mr.] Rogers' blood lead levels increased when he moved to [the] Towanda [Property]." Majority Slip Op. at 24. The Court of Special Appeals agreed with that argument, holding that "Mr. Rogers did not produce evidence that created a reasonable probability that he was exposed to lead at the Towanda Property that caused his alleged lead-exposure injuries," and that his evidence only "supported a *possibility* that he was exposed to lead there." *Rogers v. Home Equity USA, Inc.*, 228 Md. App. 620, 645 (2016) (emphasis in original).

18

The Majority acknowledges that Mr. Rogers "cannot prove that his blood lead levels increased when he moved to [the] Towanda [Property]." Majority Slip Op. at 25. Instead, the majority relies primarily upon Dr. McDaniel's testimony, which the Majority characterizes as standing for the proposition that "once [Mr.] Rogers was no longer exposed to lead, his blood lead levels would decrease after about 30 to 45 days." *Id.* From that testimony, the Majority determines that "a jury could reasonably infer that if [the] Towanda [Property] was not a contributing source" of Mr. Rogers' elevated blood lead levels, "his March 1997 lead level would have been lower," and that "his blood lead level declined in April 1997 because he had left the source of his exposure, which was [the] Towanda [Property]." *Id.* The Majority holds those inferences are sufficient to "demonstrate that [the] Towanda Property was a reasonably probable cause of [Mr. Rogers'] elevated blood lead levels, and that summary judgment was improperly granted on this ground." *Id.* at 26.

I do not believe that Dr. McDaniel's testimony was sufficient to show that the Towanda Property was a more probable source of Mr. Rogers' harm than the Chinquapin Property, where Mr. Rogers resided immediately prior to his stay at the Towanda Property and where he first displayed elevated blood lead levels. Dr. McDaniel's testimony, at most, supports the proposition that Mr. Rogers' blood lead levels would decrease within 30 to 45 days after he was no longer exposed to lead. However, because of the gap in blood lead testing between March 25, 1996 and January 8, 1997—a period during which Mr. Rogers resided at the Chinquapin Property, which Dr. McDaniel agreed was a source of his lead exposure—it may be that Mr. Rogers' blood lead levels were higher during that period than

19

during any of his recorded tests. Therefore, his 21 µg/dL blood lead level result in January 8, 1997 could, in fact, have reflected a decrease from a higher blood lead level 30 to 45 days earlier, when he resided at the Chinquapin Property. Indeed, Dr. McDaniel explicitly conceded in her deposition testimony that the January 8, 1997 result could reflect a decrease from a higher result from before Mr. Rogers moved into the Towanda Property.

Critically, Dr. McDaniel did *not* testify that, after an initial decrease when Mr. Rogers was removed from the source property of his lead exposure, his blood lead levels would *continue to further decrease* every additional 30 to 45 days.[5] Rather, that is an inference that the Majority believes a jury could reasonably draw from Dr. McDaniel's testimony. And, the Majority believes that a jury could apply that inference to the facts to conclude that, because Mr. Rogers' blood lead level did not show a significant decrease from January 1997 to March 1997, while he resided at the Towanda Property, and declined from March 1997 to April 1997, after he left that property, the Towanda Property was the

---

[5] Dr. McDaniel gave an opinion that Mr. Rogers' drop in blood lead levels from 20-21 µg/dL on March 26, 1997 to 17-18 µg/dL on April 30, 1997 was consistent with her statement that a decrease in blood lead levels would take 30 to 45 days from his removal from a source of lead exposure. However, she clarified later in her deposition that, despite conceding that it was "possible" that Mr. Rogers had a higher blood lead level prior to residing at the Towanda Property, she assumed that Mr. Rogers' blood lead levels *increased* when he moved from the Chinquapin Property to the Towanda Property. That assumption is also reflected in Dr. McDaniel's written report, dated October 24, 2014, prepared for this case, in which she stated that "[Mr.] Rogers' [blood] lead levels rose substantially while living [at the Towanda Property]." Therefore, her opinion, that the decrease in blood lead levels from March 26, 1997 to April 30, 1997 was consistent with her statement that a blood lead level reduction takes 30 to 45 days from removal from the source of exposure, was premised on an assumption that it was the *first* decrease in Mr. Rogers' blood lead levels to occur.

cause of his injury.  But, an equally plausible inference from Dr. McDaniel's testimony and the other evidence in the record is that Mr. Rogers' blood lead levels in January 1997 reflect a decrease from a higher level 30 to 45 days earlier, when he resided at the Chinquapin Property, and that his decrease in lead levels seen in the subsequent test results in March, April, and August of 1997 reflects a gradual decrease in lead leaving his system after he moved from that property.

I agree with the Majority that a jury could logically and reasonably infer from Dr. McDaniel's testimony and the other evidence in the record that the Towanda Property was a "reasonable probable cause" of his harm, as the Majority defines that term, along with the Chinquapin Property.  But, the evidence in the record and reasonable inferences deducible therefrom are not sufficient to show that the Towanda Property was a *more* probable source of Mr. Rogers' elevated blood lead levels than the Chinquapin Property and, thus, that the Towanda Property was a substantial factor cause of his harm.  As I would follow the Court of Special Appeals in affirming the trial court's grant of summary judgment on those grounds, I respectfully dissent.